**Earl P. BOLTEN, Plaintiff-Respondent,**

v.

**Floyd W. COLBURN et al., Defendants,**

*Jerry L. James et al., Garnishees,*

**William N. Colburn, Interpleader-Appellant.
No. 24136.**

Kansas City Court of Appeals.
Missouri.

Feb. 1, 1965.

Motion for Rehearing or Transfer to Supreme Court Denied April 5, 1965.

Vernon N. Kneib, St. Joseph, for appellant.

William Rosenthal, St. Joseph, for respondent.

HUNTER, Judge.

This is an appeal by William N. Colburn, interpleader, from a final judgment of the Circuit Court of Buchanan County in favor of respondent, Earl P. Bolten, and against appellant to the effect that Colburn is not a holder in due course of a certain note dated August 22, 1961, in the sum of $7,250 nor the innocent purchaser for value of it and has no right to interplead.

The persons involved in this suit are related. The defendants are Floyd W. Colburn and Alma M. Colburn and W. B. Colburn and Emma B. Colburn who are nonresidents. W. B. Colburn is the father of Floyd W. Colburn and the grandfather of interpleader William N. Colburn. Earl P. Bolten is the brother of Alma M. Colburn, and the uncle of interpleader.

The Floyd W. Colburns owned a house and some lots in St. Joseph, Mo. In the latter part of 1960 and the early part of 1961,

Bolten performed some carpentry and other work on the house and some cleanup work on the lots. At the request of Floyd W. Colburn, he turned the sale of the house and lots over to the Whitson Realty Company of St. Joseph. That company effected a sale of the property to Mr. and Mrs. Jerome E. Somerville for $8,000. As part payment the Somervilles on September 21, 1961, gave their note in the sum of $7,250 secured by a first deed of trust. On March 12, 1962, the Somervilles sold the real estate to John S. and Dorothy L. Smith who sold to Jerry L. James and Jean Ann James who assumed and agreed to pay the note, which called for payments of $65 per month.

Bolten alleges he made demand for the value of his services and materials on defendants Floyd W. Colburn and Alma Colburn but was refused.

On June 28, 1962, Bolten filed in the Circuit Court of Buchanan County a suit for $1,535 for money due on work and materials furnished defendants Floyd W. Colburn, Alma M. Colburn, W. B. Colburn and Emma B. Colburn and for his services in helping sell the house. On that same day an affidavit in attachment suit was filed and an attachment and summons issued. Bolten proceeded on the theory of garnishment in aid of attachment before judgment in a suit against nonresident defendants and named as garnishees Jerry L. James and Jean Ann James, Howard Sisson and Company, a corporation, and John Whitson and Ralph Whitson.

The Smiths had paid Whitson Realty Company $65 on July 7, 1962, and August 9, 1962, and the Jameses had paid Howard Sisson and Company, Inc., $65 on October 2, 1962, November 5, 1962, and December 3, 1962, on the mentioned note, and this money as a result of the garnishment was paid to the Sheriff of Buchanan County to be held pending court decision as to who was entitled to receive it.

On September 18, 1963, William N. Colburn appeared as interpleader, alleging that he had in good faith purchased the note

from his father for fair value and that it had been duly endorsed and assigned to him; that he was the true owner of the note in question and was entitled to the note as its owner and to the mentioned payments. Colburn also claimed reimbursement for his travel expenses, time and counsel expense incurred as a result of the garnishment action.

On March 11, 1964, Bolten in his filed answer to the interplea of William N. Colburn, admitted the note and mentioned payments had been attached through his action, alleged that interpleader Colburn is not the innocent purchaser for value of the note; that it had not been endorsed to interpleader Colburn in good faith; that no consideration had been paid by interpleader Colburn for it; and that if it was endorsed to interpleader Colburn it was so done with notice of the attachment and garnishment mentioned above "and with the further intention of defrauding said plaintiff (Bolten)."

Thus the issue was presented at the trial on March 13, 1964, as to whether intervener William N. Colburn had in good faith and for value purchased the note and as its owner and holder in due course was entitled to it and the payments made thereon or whether Bolten as the alleged creditor of the Floyd W. Colburns was entitled thereto.

Turning to the evidence on this issue, intervener William N. Colburn (hereinafter referred to as Colburn) testified he was twenty-five years old, had a tenth grade education, was married, had six children and had lived in Longview, Washington for the past eight years. He married in St. Joesph in 1956. Prior to that he had lived in St. Joseph, Missouri, as did his parents Mr. and Mrs. Floyd W. Colburn. His parents had moved to Bellingham, Washington about nine years ago and after a short stay had moved to Longview, Washington. He had gone from St. Joseph to California for nine months and then moved to Longview.

About the middle of July, 1962, Colburn's father mentioned the $7,250 note to him,

said he was ill and needed some money, and said he would like to sell it. It then had an unpaid balance of $6,900. "We started negotiations." They came to an agreement as to purchase terms. Colburn agreed to pay $5,000 for the note.

On August 1, 1962, Colburn gave his father his $3,000 check (which cleared the bank on September 13, 1962) as a "binder on the note" and on August 22, 1962, gave his personal note to his father and mother in the sum of $1,000 bearing 6% interest, payable at the rate of $50 per month (which he has kept currently paid). He also gave six head of white-faced stock averaging 900 to 1,000 pounds apiece and valued at $1,000 at least. On August 22, 1962, Colburn's parents assigned and delivered to him the note, duly notarized. On the reverse side of the note above the assignment to Colburn was typewritten the crossed out words "pay to the order of William B. Colburn and Emma B. Colburn without recourse."

Colburn testified he had no knowledge at the time he bought the note of any lawsuit or pending claim between his parents and Bolten. "I bought this note because my father said he needed money, and I have no knowledge of Mr. Bolten's actions against my father. I knew the property and for the considerable amount of money he offered it for I considered it worthy value, and I purchased the note as a business transaction only."

Colburn did not receive any payments on the note he had purchased from his parents. About September 15, 1962, he wrote to a St. Joseph, Missouri, attorney whom he had formerly known, and asked him to look into the matter. After a short time, the attorney wrote back sending a copy of the petition in the instant case, and that was the first time, according to Colburn, that he knew of any claim or suit between his parents and his uncle, Mr. Bolten. Colburn stated he had no interest in the lawsuit between Bolten and Floyd Colburn, that his only interest "is what money I have invested in this note." He had discussed the mechanics of

the deal with his personal lawyer in Longview, Herb Springer, the last part of July when his father and he were bargaining as to sales terms on the note.

On cross-examination Colburn was asked, "Q. The note was for $7,250, unpaid balance about $6,900, it was a valid first lien on real estate, and you say you bought it for $5,000. That is about a twenty-five per cent discount. What was wrong with it? A. Other than the fact that my father needed money and had been sick and off work, he was willing to sell it at that price. Q. When your father was sick and needed the note you were going to scalp the note at a twenty-five per cent discount? A. I don't know if—I considered it a shrewd business deal." Colburn testified he had no question about the honesty of his father. "He didn't discuss any of his personal business with me. He just said he needed money and he knew that I had this money and he knew what I felt about St. Jo and about our home and asked me if I would buy the note from him, and I agreed to after due consideration." * * * "Q. You don't know anything about this business of your father deciding to endorse this note to your grandfather, do you? A. Definitely not, sir. Q. And you never ever at any time knew of your uncle tending the property back here by way of selling it or ever doing any repairs on it, never heard of that? A. No, sir; I did not. A. And you and your father live right there in the same place? A. Within the same town, yes, sir. Q. How far apart do you live now? A. Probably a mile and a half, two miles."

Colburn was asked if he had seen his father in the last couple years. He answered, "Yes, sir. Q. How often do you visit him? A. I try to hold a minimum of not more than three times a month in most cases. Q. Why have you put a minimum on that? A. Because of the fact that my wife's relatives is back here and I don't want to push my family upon my wife, and we prefer living that way. Q. Do you ever allow your father to come and see you? A. He is welcome in my home anytime he

wants. He never does come." * * * "Q. Did you have a discussion with your father about this situation in this lawsuit? A. I had a discussion with my father after my attorney had told me what the condition was, and he said he didn't know anything about any lawsuit. Q. Did you ask him about whether or not his brother-in-law had done all this work? A. I inquired about him, and he said he paid Mr. Bolten for any work he had done and he had no knowledge of any lawsuit." My father said, "That is all silliness. I don't owe him any money. It is stupid."

Colburn was cross-examined in great detail as to where he got the money he used to purchase the note from his father. He explained that when he first went to Longview he bought a home on contract, paying $175 down from savings from his wages. He soon sold it making about a $400 profit. He then rented a house and pasturage for $45 a month and with his $400 profit bought five head of beef cattle. He with the help of his wife bought, fed and sold cattle on a small basis. He borrowed $300 from the National Bank of Commerce "to expand" and that plus more salary savings enabled him to finally build up to seventeen head of cattle. Eventually he had enough to pay off the $300 note and upon liquidation of his cattle had about $1,800 remaining from the cattle sale. He moved to town for awhile, and again moved to the country and rented a house. He reinvested in livestock buying about seventeen head and continued to buy, feed and sell cattle.

Colburn decided to again liquidate his cattle and put an ad in the newspaper offering them for sale. In June, 1962, when his father first told him he would like to sell the $7,250 note Colburn had between $3,600 and $3,700 in the National Bank of Commerce in Longview, plus six head of cattle he had not sold.

As to Colburn's employments, with the exception of a few weeks he was steadily employed all the time he lived in Longview. He had four different jobs over those eight years. His first employment at Longview was with Warehouser Lumber Company. He earned $1.85 per hour and worked 6 or seven days a week. His weekly take home pay was $100 to $125. After nine months of that employment he became a salesman for Schneider Brothers Hardware where he earned approximately $90.00 a week. After four years of that employment (and 90 days in Baltimore, Maryland) he was re-employed by Schneider Brothers Hardware where he remained 11 months, earning $100.00 a week. He then obtained his present job with Longview Plumbing and Appliance Company as an appliance salesman earning about $500 a month, plus commissions. In 1962 his total earnings were between $6,500 to $7,000.

Colburn testified it was his and his wife's practice to save something, usually about $50 or more every two weeks out of his salary and invest it in his cattle business. This is partly why he was able to build up his cattle to some seventeen head just before he sold out all but six of them in June 1962. He originally banked in the National Bank of Commerce in Longview and kept his account there until 1963 when he transferred to Cowlitz County Bank because it was a new bank located closer to him. He was asked how much it took for him, his wife and children to live on. He answered, "A. I honestly don't know. I would say that an average—I honestly don't know. I would say that an average—I average the present time, I am living a little bit better, maybe I spent $250 a month. Q. And you are certain you don't spend over $250 a month? A. I am not certain of it; no, sir. Q. To keep the eight of you?" * * * "A. $250, like I said I estimated that as an estimate. Q. You ought to be a pretty good estimator, you are the one that is keeping them, aren't you? A. Yes, I don't know what you are trying to infer. When a person gets sick and has an extra doctor bill he doesn't evaluate an extra expense when you get sick and miss a day's work. I am talking about what possibly I could have lived on. I honestly

cannot say the dollar value, how much it was." After explaining how he had accumulated the purchase money, and upon being asked if he had anything else to say, Colburn stated, "There is only one comment I would like to make in the eyes of the Court as far as how I acquired this money, and people can believe it or not. But my wife and I were born poor and we intend to make something of our lives and we have done personal sacrificing in clothing and every other way and devoted ourselves in a feeling of saving money and been able to have a home so we can eventually buy a farm and buy beef livestock, and this money is earned with our own sweat and we have paid for it out of our pocket, and this note is my note. That's all I have to say about it."

In an effort to show Colburn knew of some past conduct of his father to evade bills Colburn was asked, "Q. Isn't it true that your father first bought this property, then he got sued in an attachment and he immediately transferred it to your grandfather, William B. Colburn? A. I don't know. Q. Then the minute they got rid of the attachment they transferred it back to Floyd? A. I don't know their business. Q. Then your father got sued and he immediately transferred it again to your grandfather, William C. Colburn? A. If this has happened it is without my knowledge."

There was testimony by witness Whitson that he mailed Floyd W. Colburn a copy of the papers in the attachment suit "in July of 1962". Colburn testified he received the abstract of title to the premises on August 22, 1962, but did not have it brought up to date until several weeks later. Until brought up to date the abstract did not show anything concerning the present dispute.

Earl Bolten testified Colburn left St. Joseph for Longview, Washington "in '58, '57, along in there," and returned he felt "pretty sure" in 1960, around August or September for a few days. He conceded it could possibly have been in 1959. Bolten

was asked if Colburn was present at any time he was working on the Eureka property and answered, "he knew I was working on them. Q. Was he there when you were working on them at various times? A. Yes." Bolten also stated Colburn had unsuccessfully tried to borrow some money from him and from W. B. Colburn. In rebuttal Colburn testified it was in September, 1959, when he was in St. Joseph, that his wife and three children were with him; that he was there on a vacation and had purchased and used a round trip railroad ticket. He stated he didn't try to borrow money from anyone and did not see Bolten doing any work on the Eureka Street property.

In a case of this kind tried to the court we review the record de novo and determine the credibility, weight and value to be accorded the testimony and other evidence, and arrive at our own conclusions based upon the entire record. In so doing we give due deference to the opportunity of the trial judge to see and hear the witnesses and to judge their credibility. Also, we should not set aside the judgment unless clearly erroneous. Civil Rules 73.01(d), V.A.M.R.; Chailland v. M. F. A. Mutual Insurance Company, En Banc, Mo., 375 S.W.2d 78(1); Kelso v. Kelso, Mo.Sup., 306 S.W.2d 534, 71 A.L.R.2d 258.

It is undisputed that at the time Colburn sought to intervene he not only had the note in question in his possession but also that the note on its face disclosed that it had been assigned to him. It is relatively undisputed, and certainly there is no contrary evidence, that Colburn paid his father for it $3,000 (by check which is in evidence as an exhibit), gave his $1,000 note (which is in evidence as an exhibit) and six cattle worth at least $1,000, and that his father and mother did transfer and deliver the note (which is in evidence as an exhibit) to him on August 22, 1962.

We proceed to state some of the rules of law involved in ruling this case. The basic rule on burden of proof on the

issue of fraud as stated in 7 C.J.S. Attachment § 359, page 568, is that "If a transfer of the property to the intervener is admitted, but fraud is alleged and relied on to avoid such conveyance, the burden of proof rests upon the party who sets up fraud." See, also, Section 401.059 RSMo.1959, V.A.M.S.; Local Finance Co. v. Charlton, Mo.App., 289 S.W.2d 157. It is likewise the rule that a sale made with intent to defraud a creditor will not be held invalid against the purchaser, if he buys it without notice of such intent, and for a valuable consideration paid before notice of the vendor's fraud. Dougherty v. Cooper, 77 Mo. 528; Section 401.052 RSMo.1959, V.A.M.S.

To be a transferee without notice, the transferee must be such at the time of the payment of the purchase money. Citizens' Bank of Hayti v. McElvain, 280 Mo. 505, 219 S.W. 75, 79. If the transferee have knowledge of the debtor's purpose to hinder, delay or defraud his creditors, the transfer is nonetheless void no matter how valuable the consideration. Emlet v. Gillis, Mo.Sup., 63 S.W.2d 12.

Fraud is not to be presumed but must be proved. To satisfy this burden of proof the evidence produced must be clear and convincing. Mitchell v. McClelland, Mo.App., 306 S.W.2d 75; Herrold v. Hart, Mo.Sup., 290 S.W.2d 49. In so saying it is recognized that fraud can rarely be proved by direct evidence. It is most frequently to be deduced from the circumstances surrounding the transaction, and from the acts of the parties. Mere suspicion is not, however, sufficient. The fraud must be proved as an affirmative fact, and the proof must be of such a positive and definite character as to convince the mind of the chancellor, for it is never presumed and, if the facts shown are consistent as well with honesty as with fraud, the transaction should be held honest. Moberly v. Watson, Mo.Sup., 340 Mo. 820, 102 S.W.2d 886, 889.

The payment of the full value of a note is not necessary to make a holder for value, although the consideration paid must be more than nominal. Kincaid v. Estes, 218 Mo.App. 109, 262 S.W. 399. While inadequacy of consideration in the conveyance of property by an insolvent debtor is held to be a badge of fraud, yet it is not generally regarded as sufficient alone to raise a legal inference of fraud unless so gross as to create the assumption the conveyance could not have been made in good faith. Weigel v. Wood, 355 Mo. 11, 194 S.W.2d 40; Munford v. Sheldon, 320 Mo. 1077, 9 S.W.2d 907.

It is the rule a conveyance from father to child will be closely scrutinized, but the existence of the relationship does not of itself establish fraud in the transfer. Moberly v. Watson, 340 Mo. 820, 102 S.W. 2d 886; Allison v. Mildred, Mo.Sup., 307 S.W.2d 447. It is not until a creditor has established badges of fraud sufficient to raise a presumption of fraud that the burden of explaining the transaction and showing its good faith shifts to the parties to such conveyance. Oeting v. Green, 350 Mo. 457, 166 S.W.2d 548; Local Finance Co. v. Charlton, supra.

Turning to the question of whether Colburn in good faith purchased a negotiable note for valuable consideration without notice of any defect, we have very carefully examined the entire record and have come to the conclusion that he did purchase the note in good faith for a valuable consideration without notice of any defect and is the holder in due course of it. Bolten, who has the burden of proof on the fraud issue, has not produced any evidence showing bad faith or fraud on the part of Colburn and has failed to carry his burden of proof on the fraud issue. Additionally, it is a part of our duty on review to consider credibility and we are convinced Colburn's testimony concerning the amount he paid for the $7,250 note and that he bought it in good faith without knowledge of the

pending suit between Bolten and his father is credible.

Since our conclusion is different from that reached by the trial court we will refer to the reasons given by that court and will endeavor to explain briefly why they have not been persuasive in our judgment.

■ The trial court thought Colburn's testimony to be so inconsistent as to be ridiculous, naming three "inconsistencies". The first is that although Colburn's father must have been aware of Bolten's claim against him when he sold the note (and we agree the evidence persuades that Colburn's father did know this) that it is incredible to conclude the father did not tell Colburn and that Colburn did not know it. However, there is no evidence or reasonable inference from evidence that Colburn knew it and he denies he knew it. The mere fact that the transaction is between a father and son is not evidence of fraud on the part of the son, or that he knew what the father knew. The personal relationship between Colburn and his father does not appear to have been a close one. For many years they had separate homes. Each seemed to go his own independent way with just limited and routine visiting. Colburn explained in detail how the entire transaction occurred, and while the father-son relationship might at the outset create a suspicion and call for a very careful examination of the entire transaction, our review of the evidence has dispelled that suspicion.

The second "inconsistency" named by the trial court is that it is incredible that Colburn could have saved the money to pay the $3,000 for the note and to give his father $1,000 worth of cattle. However, not only did Colburn explain how he had over the years saved approximately $3,600 by July, 1962, and had it in the bank but also he produced and placed in evidence his cancelled check to his father and mother for $3,000 on the National Bank of Commerce, Longview, Washington showing it had cleared that bank near the time in question.

The trial court stated, "He claims he is now rearing six children, himself and his wife on $250 a month and saving the balance of his salary. The court simply doesn't believe it. It is beyond comprehension that a man could do these things." As we read Colburn's testimony, and we have quoted it liberally in this opinion, he does not claim his entire family expenses never exceeded $250 a month. Even so, the evidence discloses he lived very frugally in inexpensive housing in a rural area and we do not believe it can be safely or reasonably said that Colburn could not have lived economically enough to have "tried to take $50 out of every two weeks pay check" to invest in his cattle as he testified.

The trial court also thought Colburn evasive and upset at simple questions. It is notable, and possibly overlooked, that he testified he was "nervous and * * * not familiar with court law", and that on one occasion when he asked that a question be repeated he explained, "I have one damaged ear and I cannot understand." In spite of this he did bear up well on the witness stand, including a long cross-examination. We have carefully examined the record and conclude that for a twenty-five year old man with a tenth grade education, unaccustomed to being in court as he said he was, he did a credible job of frankly answering searching questions calling for a firm memory and considerable detail. While we do not have the advantage of having seen Colburn testify, the transcript does not cause us to conclude he was evasive or upset.

Some point is also made of the fact that Colburn paid only $5,000 for a note having an unpaid balance of approximately $6,900. There is no evidence as to the commutated value of the note as of the day of its purchase. However, the note was payable at the rate of only $65 monthly and Colburn's purchase price for it included $3,000 in a lump sum plus six head of cattle, as well as a $1,000 note payable at the rate of $50 monthly. The father's statement he had been ill and needed immediate cash, if true,

and Colburn states he did believe it, would explain to Colburn why the father was willing to sell at the stated price.

Attention is directed to Bolten's statement Colburn visited in St. Joseph, Missouri, for a few days in 1960 (Colburn says 1959) when Bolten was doing "some work" around the house and lots in question and that Colburn saw him doing it. Bolten's statement as to whether the year was 1960, 1961, or 1959 is somewhat uncertain whereas Colburn's statement of 1959 was both certain and related to events including the presence of his wife and three children, all on vacation, that would assist him in remembering the correct date. Additionally, Bolten's claim in his petition for work performed at the house includes such things as cleaning up and hauling away trash, repairing a back door, mowing the lawn, cleaning up brush on the vacant lots, and replacing a window pane. Even if Colburn is mistaken about the date of his St. Joseph visit (we accept his testimony as more likely to be accurate) and did see Bolten mowing the lawn, or cleaning up some brush (and has forgotten it), seeing these things would not in and of themselves put him on notice that Bolten, if entitled to be paid for them, had not been paid or that Colburn's father was selling the mentioned note to hinder or avoid payment of such debts.

It is the law that if a plaintiff in attachment shall cause a person to be summoned as garnishee and shall fail to recover judgment against such garnishee, the garnishee is entitled to a judgment for a sum sufficient to indemnify him for his time and expenses, and a reasonable attorney's fee in attending and answering and defending in subsequent proceedings as garnishee. Civil Rule 90.23. The evidence is that Colburn's round trip cost of transportation and travel expense from Longview, Washington to St. Joseph, Missouri was $225, that he lost $100 in wages because of his attendance at the trial, and that he was charged $300 by his attorney for answering and defending in these proceedings.

Colburn is entitled to a judgment in the sum of $625.00 as indemnity for them.

The judgment is reversed and the cause is remanded with directions that a judgment for William N. Colburn, interpleader, and against Earl P. Bolten, respondent, be entered in accordance with this opinion, including the holding that William N. Colburn is the bona fide purchaser for value of the negotiable $7,250.00 note and as such is entitled to it and to the payments made thereon that have been paid to the Sheriff, and including an award of $625.00 to William N. Colburn as indemnity for his time, his attorneys' fee and travel expense in defending against the garnishment.

All concur.

BROADDUS, J., not participating.