Eldon D. TAYLOR and Garnet J.
Taylor, Appellants,

v.

WESTERN CASUALTY & SURETY
COMPANY, a corporation,
Respondent.

No. KCD 26732.

Missouri Court of Appeals,
Kansas City District.

May 5, 1975.

Austin B. Speers, Kansas City (Speers & Slyter, Kansas City, of counsel), for appellants.

Thomas E. Deacy, Jr. and Edward W. Mullen, Kansas City (Deacy & Deacy, Kansas City, of counsel), for respondent.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and TURNAGE, J.

PRITCHARD, Chief Judge.

In this court-tried case, respondent Western Casualty and Surety Company, was granted judgment upon appellants' petition, which in general alleged that a paltry settlement of a minor's claim for personal injuries occasioned by electrical shock was fraudulently procured by Western in conspiracy with its agents and its insured. It is said that the fraud consisted of the concealment of the fact that Western had an insurance policy on Se Ma No Electrical Cooperative's operations covering it against liability for personal injuries. The claim was for $50,000.00 actual and $150,000.00 punitive damages.

At the time of trial, January 15, 1973, appellants' son, James K. Taylor, was 18 years old and was attending a junior college in Longview, Washington. In May, 1965, when he was 10 years old, James went up a ladder onto the roof of a building to look at a birdhouse, walked across the roof underneath a power line erected by Se Ma No Electric Cooperative, and came into contact with it. James then lived with his parents in a communal colony called Zion's Order of the Sons of Levi, Inc., near Ava, Missouri. He was taken unconscious to a hospital in Springfield, Missouri. He remembered that he had severe burns on his stomach, arms and armpits, which caused him to have surgery and both arms were removed below the elbows.

James' father, appellant Eldon D. Taylor, testified that he joined the Zion Order in 1951 in Utah. That year he married Garnet Taylor, who is the daughter of the head of the Order, Marl Kilgore. The Order owned about 1700 acres in Douglas County, Missouri. Eldon's duties on the ranch involved mechanically taking care of all the vehicles and tractors. The mode of life of the communal group, which consisted of several families, was the sharing of all earthly properties in a communal fund and all monies received for labors were taken in and disbursed by the manager of the group. Separate living quarters were maintained, but there was a community dining hall where the families ate their meals. Access to television and newspapers was restricted by Mr. Kilgore. During his rebuttal testimony it was elicited from Eldon that had he known that there was insurance covering the claim he would not have settled his claim and his wife's claim "for loss of services for eight thousand dollars." He relied "on the fact that there was no insurance in making this settlement" for loss of services on the son's case.

On September 24, 1965, appellants, without James, appeared in the circuit court of Douglas County, at Ava, Missouri. Marl Kilgore accompanied them. They first went to the law office of Quentin Haden, where they remained for 10 or 15 minutes. The record of the Douglas County circuit court shows that James Taylor was plaintiff, by his next friend, Eldon Taylor, and was represented by Mr. Quentin Haden. Defendant, Se Ma No Electric Cooperative, Inc., was represented by Mr. Harold Fisher, Springfield, Missouri. At that hearing, Eldon Taylor was interrogated by Mr. Haden: He is the father of James who would have soon been 11 years old. James' injuries were described, and a discussion had been had concerning fitting him with artificial hands, and he had his left artificial hand in use—it would have been awhile before the right artificial hand could be made. Eldon had discussed the settlement that was being entered into with his wife, and his father-in-law, Mr. Kilgore, had heard of the settlement. He understood that $2,000 would be put in a "trust fund of some kind, handle it

through court, and there will be $6,000 cash and the Se Ma No will settle for the hospital and doctor bills, those things, besides that." The hospital and doctor bills ran between $1,800 and $2,000, and there would be an overall figure of $10,000 in the settlement. Eldon had discussed the case with an attorney, Mr. Curry, and with an attorney from Kansas City. As to how the $10,000 figure was arrived at, Eldon testified: "A. That is what my wife and I decided upon that was reasonable. We talked it over with Mr. Jackson [Cash Jackson, since deceased, then manager of Se Ma No]. Q. But the figure you had arrived at was between you and your wife and Mr. Kilgore? A. Between me and my wife, yes. Q. You do think that amount is fair and reasonable? A. I believe that amount is reasonable, yes." In answer to the court's questions, Eldon testified (somewhat contrary to what he had previously told the court) he had not talked with an attorney about representing him and about the injuries the boy received, "A. We mentioned what we was going to do, we said we hadn't thought about it yet. It was mentioned how much we cared to get, we said we didn't have anything in mind at all, we thought we would try to settle it out of court." He felt like what he was getting in this case was reasonable. In response to questions by the court, "What about you, Mr. Kilgore, do you feel like this is fair under the circumstances? MR. KILGORE: Yes, I do. They offered settlement. We never threatened to sue or anything. They offered the settlement themselves. I talked to Mr. Curry some and also to this man from Kansas City. They both thought it is much better to settle it out of court." From his discussions with Mr. Curry and his attorney friend from Kansas City, Mr. Kilgore felt the amount was reasonable: "Yes, I do, settlement out of court." [The attorney friend in Kansas City is later referred to in the present transcript as appellants' present counsel.]

On cross-examination by Mr. Fisher, Eldon understood that $3,750 was being paid into court to him as next friend, of which $250 attorney fees was being paid to Mr. Haden; $2,000 was going into probate court for James' guardianship. [From checks drawn by Allen, Woolsey & Fisher Trust account, $3,500 was paid to Eldon Taylor, as James' next friend; $4,500 was paid to Eldon and Garnet, parents and natural guardians of James; and a total of $2,004.85 was paid for various medical, hospital and other expenses on James' account.] At the time of that hearing, James was under services offered by the Crippled Children of the state, and all medical expenses were given him without charge, including prothesis and the artificial hand. Mrs. Taylor heard her husband's testimony and agreed with it, and she thought the settlement was fair and reasonable. The $2,000 for James was put in the bank as a trust fund for James, and $4,500 was used to open a checking account for the Zion Order, in Marl Kilgore's name with Eldon and Garnet as signers.

Following the casualty, Eldon was never contacted by anyone who identified themselves as being from an insurance company. Cash Jackson of Se Ma No came to visit at the hospital to see how James was.

Answers to interrogatories made by Western in the federal court case of James were received by the court. In these Western stated that appellants had discussed James' casualty with Se Ma No's manager, Cash Jackson, on several occasions, and that they negotiated with Jackson for the settlement of the claim. Jackson had also visited and inspected the area of the casualty during the spring and summer of 1965. No officer, adjuster or investigator of Western handled the casualty investigation. There was a claim number, CL–167225, assigned to James' casualty, and Mr. Clifton Kuplen, claims attorney and assistant secretary, supervised the file.

In an effort to show there was no custom or practice in the insurance industry to have counsel issue settlement checks in payment of claims, appellants presented Mr. Ralph Gundelfinger, a claims manager for 21 years, who had supervised and settled thousands of claims. In his experience he had always issued an insurance company draft upon the settlement of a claim, and that insurance companies would issue their own drafts on settlement because it would be a definite safeguard because the case is not completely closed until the claim draft is accepted, endorsed and cashed. Attorney, Angelo J. Falcone, testified that when he entered the practice, he was employed by Western as a claim adjuster and always issued Western's claim drafts to settle its cases. Western's Kansas City claims manager, Gerald L. Wait, testified that although normally it was customary for Western to use its own adjusters to investigate and make an effort to conclude a claim, he has had occasions where the insured had negotiated a settlement and then called upon the insurer to reimburse him. There were other occasions when the insured, for its own reasons, handled the entire matter and negotiated a settlement, which might particularly be true where the insured was a business operation with its own management. It was the policy and practice of the company to approve settlements investigated and negotiated in a rural community by an insured. In a remote area, it would not be beyond the policy of the company, where court approval of a settlement in a remote area was being sought, to authorize an attorney handling the matter to issue his own check or draft in payment of the settlement or judgment, and then be reimbursed by the company.

Appellant's petition, briefly stated as did the trial court in its conclusions, alleged these facts as bases for fraud: "(1) There was no insurance; (2) There was no liability; (3) Cash Jackson would have to pay any monetary recovery from his own pocket; (4) Any large amount of recovery would break the power company and cause loss of electricity to the ranch; (5) Playing upon the 'natural fears of colistered, restricted and untutored people' of not having electricity for their community; (6) Deliberately directing that only plaintiffs be present at the court hearing; (7) Furnishing plaintiffs with a lawyer who did not explain to plaintiffs anything about the nature of their claim or of their son's claim and who conducted his entire conference with plaintiffs in the presence of Cash Jackson, managing director of Se Ma No; (8) Inducing plaintiffs to agree to 'an unconscionable, inadequate and improper settlement'; (9) Agreeing to a settlement to plaintiffs knowing that plaintiffs would never receive any part of the amount settled upon."

The gist of the damages prayed for by appellants is for their loss occasioned by being required to expend large sums of money for medical expenses, etc., for James; and being required to assist and help him in personal ways; their loss of his companionship, pleasure and society; and for the loss of his services. It was pleaded by appellants that James' case was reopened in Douglas County and in December, 1969, Western paid an additional $55,000.00 for his injuries. The allegation was denied by Western insofar as it was inconsistent with the court records, said to be the best evidence. However, counsel stated to this court in oral argument that on December 29, 1969, $55,000.00 additionally was paid on the minor's claim only by Western. Western used its own name on the drafts in payment of the additional amount of the minor's settlement.

■ The trial court concluded, and properly so under this record, that there was no evidence whatsoever to support the allegations above numbered (2), (3), (4), (5), (6) and (7). The court found that appellants were literate persons of average intelligence and that they were influenced in the negotiations by Marl Kilgore, father of appellant Garnet J. Taylor, and leader of the

religious order to which they belonged. Appellants first say that this finding was error "without finding additionally that the mode and style of life of appellants made them virtual psychological prisoners and incapable of any rational ability to decide money matters without independent, impartial advice, which they did not receive prior to, or at their settlement." Appellants concede that they were literate in the sense that they can read or write and admit that they are of average intelligence. The trial court had these parties before it and was there able to judge their understanding and perception of the matters involved in their 1965 settlement. The reading of the transcript of the record here shows that these appellants had good ability to understand questions put to them, to which their answers were responsive. Although the evidence shows that the communal religious life in which appellants participated was cloistered and was rigidly governed by Marl Kilgore, the leader, there is no showing, or even a proper inference, that it was such as it would impair their ability to know and appreciate that their son's injuries were compensable, and that Se Ma No was, or could be, liable therefor. It is true that Marl Kilgore participated in the discussions of settlement; both he and appellants thought it was reasonable after discussion with attorney Curry, and appellants' present counsel in Kansas City. Clearly, from the record of the trial court in Douglas County, it was appellants' decision to accept the "settlement out of court." There was sufficient evidence for the court to find that appellants did have the independent advice of at least two, perhaps three, attorneys. The trial court did not err in failing to make the above additional findings.

■■ Appellants next say that the court erred in its conclusion of law that the evidence failed to establish by clear and convincing evidence that the settlement was procured by Western's fraud. It is first said that attorney Fisher's statement to appellants that he was Cash Jackson's lawyer (when in fact he was Western's counsel) was a direct representation to them that there was no insurance. Jackson was, of course, Se Ma No's manager. There is no evidence that Mr. Fisher's statement was false. Under the normal liability insurance policy, as is well known, counsel for the insurer also represents the insured in defending or settling a claim. The real question boils down to whether, under the facts, Mr. Fisher was under a duty to disclose that there was insurance and that he represented Western. There are cases which say that silence may in proper circumstances amount to a representation upon which the other party may rely. "However, before such silence can amount to a representation *there must be a duty to speak* and there is no duty to speak where the other party has knowledge of the true facts." National Alfalfa D. & M. Co. v. 4010 Washington, Inc., 434 S.W.2d 757, 765 (Mo.App.1968) (Italics added); "Silence or non-disclosure of a material fact, when used as an inducement to another, can be an act of fraud." Miller v. Higgins, 452 S.W.2d 121, 124[3–5] (Mo. 1970), and cases cited. See generally, 37 Am.Jur.2d Fraud and Deceit, § 145, p. 198, et seq. From all that appears here, the parties, appellants on the one hand and Cash Jackson (for Se Ma No) on the other, had been and were, dealing at arm's length in settlement negotiations. Mr. Fisher was certainly not, under any stretch of the imagination, the agent of appellants. He thus could not be in a fiduciary or confidential relationship with them. Cf. Schneider v. DeMerville, 400 S.W.2d 109, 112 (Mo. 1966). Mr. Fisher was there to effectuate a settlement, which clearly, before the hearing, had been agreed to by appellants' own decision and upon advice of others (Marl Kilgore and at least two attorneys). Mr. Fisher had no duty to speak. There is nothing in the record to show that there was any inducement to appellants by any concealment of the existence of insurance

which would cause them to make the decision to settle the case for the amount offered. There is thus no evidence to support the trial court's conclusion (in its memorandum separate from the findings of facts and conclusions of law) that there was a misrepresentation as to the existence of insurance. But even if there had been, under a sufficient showing of evidence, such a misrepresentation, the trial court was not incorrect in further concluding that it was not material because there was no showing that appellants believed that Se Ma No, which was primarily liable, was unable to satisfy any judgment obtained against it. Under the record, there is sufficient evidence to conclude that counsel's use of his firm's own checks to pay the settlement was not out of the ordinary as a practice or custom in this rural community.

The judgment is affirmed.

All concur.