**CENTERRE BANK OF INDEPENDENCE, N.A., Plaintiff–Appellant,**

**v.**

**Curtis BLISS and Milton W. Adams, Defendants–Cross–Appellants.**

**No. WD 39678.**

Missouri Court of Appeals,
Western District.

Nov. 29, 1988.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
Jan. 31, 1989.

Application to Transfer Denied
March 14, 1989.

Norman Humphrey, Jr., Kenneth B. McClain (argued), Independence, for plaintiff-appellant.

Paul H. Niewald (argued), Alice Amick, Kansas City, for defendants-cross-appellants.

Before NUGENT, P.J., and KENNEDY Judge and CLARK, JJ.

NUGENT, Presiding Judge.

Plaintiff Centerre Bank of Independence, N.A., (formerly the First National Bank of Independence) appeals from the judgment entered in its favor on a verdict of the jury for one dollar on Count I, which charged breach of lease, and from the court's refusal to submit punitive damages on Count IV, which alleged fraudulent misrepresentation. Defendants Curtis Bliss and Milton W. Adams cross-appeal the judgment entered on the jury's verdict awarding plaintiff bank one dollar on Count I and $291,000 actual damages on Count IV; they also complain that the trial court erred in directing a verdict against them on their counterclaim for tortious interference with contract.

We reverse the judgment in favor of the plaintiff on Counts I and IV and affirm the judgment on defendant's counterclaim.

## I. The Facts

In 1973 defendants Bliss and Adams, partners doing business under the name of Noland South Development Company, leased to Shortman Development Company, a Kansas corporation, property located at 4300 Noland Road in Independence. Financed by Fidelity National Bank and Trust Co. of Topeka, Shortman constructed a new car showroom on the site. A deed of trust on the building secured the bank. Fidelity also set up an escrow agreement with Shortman by the terms of which Fidelity paid the rent due Noland South. Under the terms of the lease, the title to the building remained in the lessee until the expiration date of the lease when it would pass to the lessor, Noland South Development Company.

The lease required the lessee to pay all expenses on the leasehold estate including utilities, taxes, insurance, and maintenance and upkeep of the building. It also provided that the insurance policy on the property name the lessee as the principal insured and the lessor as an additional insured. The lease granted an initial term of ten years with an option in the lessee to extend the lease for four successive terms of five years upon the lessee's notifying the lessor in writing of its intent at least one hundred eighty days before the last day of the term. Lessee's exercise of the option did not require lessor's consent.

Article X of the lease reads as follows:

The Lessee by the nature of its business operates various functions related to the sale of new and used automobiles and may do so under different legal entities therefor Lessor and Lessee covenant and agree that after the building described herein is completed, and all conditions precedent thereto fulfilled, that Lessee may assign or sublet, in whole or in part, the leased premises, to such legal entity without consent of the Lessor, provided Lessee remains responsible for cov-

enants and agreements incurred by it herein and provided further, that assignee shall simultaneously agree in writing to assume and perform all the terms, covenants, conditions and agreements of this Lease imposed upon the Lessee named herein. The Lessee shall deliver to the Lessor, a duplicate original of such assignment and assumption agreement in recordable form within ten (10) days after the execution thereof. The Lessee shall have the right to assign, sublet or transfer its interest in the premises to a party other than a related party, provided that in addition to the foregoing requirements, such assignment or transfer shall be compatible with the development of the shopping center by Lessor and provided further that Lessor consents in writing to such assignment or transfer, which consent shall not be unreasonably withheld.

Article XI in its pertinent part reads as follows:

11.1 The Lessee may at any time and from time to time during the term of this Lease, mortgage the leasehold estate hereby granted to it; ... provided the entire proceeds of such loan shall be applied in payment of all or part of the cost of constructing a new building or buildings and improvements upon the premises.... Such loan shall have a maturity date no later than date upon which the term of this Lease is scheduled to expire.

Article XV reads as follows in its pertinent parts:

15.1 In the event the Lessee shall fail or neglect to perform ... any covenant, ... hereunder for thirty (30) days, except non-payment of rent which default shall be corrected within ten (10) days, after written notice thereof from Lessor, then without further notice or demand the Lessor shall have the right to declare this Lease null and void and to enter upon and take possession of the leased premises and all improvements thereon; provided however, that if any default for which notice has been given, as aforesaid, shall be remedied within said thirty (30) day period, except non-payment of rent, which default shall be corrected ten (10) days after written notice is given, then this Lease shall remain in full force and effect the same as though no such default had occurred.

In October, 1974, Bill Rodekopf Motors, Inc., acquired the building and its fixtures and furniture by sublease from Shortman. Later, Shortman assigned the lease to Rodekopf. Defendant Bliss testified that he received notice of the assignment in either 1978 or 1979. In 1979 when first asked to accept the assignment and assumption of liability executed by Bill Rodekopf Motors, the defendants consented.

In January, 1979, plaintiff bank lent $100,000 to Rodekopf, but obtained a Small Business Administration guaranty of the loan because it believed that Rodekopf did not have sufficient collateral. As a part of that transaction, Rodekopf Motors, as lessee, assigned the Shortman lease to the bank. As a general rule, Centerre did not take lease assignments as security, but the SBA required this arrangement as a condition for guarantying the loan. The bank did not record the assignments, and no one advised defendants of the loan or the assignment. In addition to the original $100,-000 loan, on December 12, 1979, the bank lent $80,000 to Rodekopf, taking another such lease assignment explicitly given as security for payment of the note. This time the bank recorded the assignment, but again no one told defendants of the loan or the security arrangements or furnished defendants with a copy or notice of the assignment.

Despite those loans, Rodekopf was soon short of funds, therefore, on March 5, 1980, Centerre consolidated Rodekopf's debts in a new $400,000 loan, applying the proceeds to payment of all Rodekopf's outstanding indebtedness, including the remaining debt due Fidelity National of Topeka. As additional security for that new loan, Rodekopf executed a deed of trust in favor of Centerre on the building and a lease assignment. The assignment document was a duplicate of the December 12, 1979, assignment with the original amounts and dates

whited out and the new amounts and dates typed over the whiting. The new assignment was not recorded, although on March 11, 1980, Centerre did record the contemporaneous note and the deed of trust on the leasehold improvements.

On March 13 the bank recorded its deed of release acknowledging satisfaction of the December 12, 1979, debt and releasing the property, that is, the leasehold interest in the defendants' property, from the lien and effect of the deed of trust. Paul Weston, the plaintiff's first witness, acknowledged that the bank thereby released the December, 1979, assignment of the lease.

As part of the $400,000 loan consolidation, Centerre and Rodekopf also entered into an escrow agreement to ensure that Rodekopf paid the rent and other payments due under the terms of the lease. The escrow agreement provided that the bank would have no duty or responsibility except as an escrow agent and that it would not be liable for payment of any of Rodekopf's debts if Rodekopf failed to pay or perform. Paul Weston, then chief loan officer of Centerre Bank, directed R.D. Stoneking, vice president in commercial loans, to notify defendants Bliss and Adams by letter of the loan and the escrow agreement. The letter dated March 25, 1980, stated:

> Pursuant to our phone conversation today, I am forwarding a cashier's check in the amount of $2083.33. As we discussed, this represents the current payment on the above referenced lease accounts you service. All future payments, until you are notified otherwise, will come from our bank via an escrow account we have with Bill Rodekopf Motors, Inc.
>
> If at any time you have questions regarding this or other problems materialize, I would ask that you contact me immediately. We have a sizeable security interest in the leasehold improvements on this property and, therefore, are most interested in keeping this lease current.

The bank did not send defendants any of the March 5 loan documents or security instruments and made no mention to defendants of the size of the loan, the terms of the deed of trust or of the execution by Rodekopf of any assignment of the lease to Centerre at any time. Mr. Weston testified that in March, 1980, the bank expected Rodekopf to perform all of the terms of the security agreements.

In April, May and June of 1980, in accordance with the escrow agreement, Rodekopf paid Centerre the rental payments but then ran out of money. After that and until the lease expired in June, 1983, Centerre paid the rent, taxes and insurance using its own money.

On August 20, 1980, in connection with another matter defendant Adams forwarded to another attorney a title report that included mention of the real property on which Rodekopf Motors' building stood. The report specifically excepted the $400,000 debt secured by the March, 1980, deed of trust on the leasehold and in another exception said: "64. Assignment of Lease recorded as Document No. 1–407248 in Book I–977 at Page 2030 filed December 13, 1979. Leasehold only." Exception 64 did not, however, further identify the leasehold, the property it covered or the parties to the lease.

Defendant Bliss received notice on December 24, 1980, that Rodekopf Motors had shut its doors. Defendant Adams wrote to both Centerre and Rodekopf on January 6, 1981, asking who had charge of the building and requesting an inspection. He also asked that insurance on the premises be secured and that the utility service be maintained and requested a meeting with bank officers and Mr. Rodekopf to discuss the future of the property. The defendants, the bank's Mr. Weston and Mr. Stoneking, and Mr. Rodekopf, met on January 13, 1981, at the Rodekopf building. The defendants were told that Mr. Rodekopf was in charge of the building. Mr. Weston testified that at that meeting the defendants asked the bank officers whether the bank "would like to become the tenant in the building, ... to be in the position of Mr. Rodekopf. We told them that we could not because of legal matters." Rodekopf's $400,000 note, due on March 5, 1981, was not yet in default. Nevertheless, knowing

that Rodekopf could not pay for it, "to keep the lease provisions in full force," as Mr. Weston said, Centerre bought insurance for the building, listing Centerre as the insured and defendants' partnership as the additional insured.

On February 17, 1981, the parties met again. Centerre's management, knowing that Rodekopf could not recover, decided that it would be better off if it could buy defendant's fee simple title to the property. Accordingly, they offered to purchase the property. The parties also discussed the possibility of a sublease. Mr. Weston testified that the bank officers told defendants that Rodekopf could not recover and that Centerre "wanted to be in his position, thought we were there, and that we would take over as soon as the note would allow it to do so." Defendant Adams' notes of the meeting reflect that defendants knew of Centerre's intention to "take over"; his note states, "Bank will take over on 3/5/81."

Neither defendant objected to the talk of the bank's taking over. In response to Centerre's request, defendants said that they were not interested in selling the land but that they might be interested in making a new lease and buying out Centerre's interest. Mr. Adams also asked about any potential prospects as new tenants.

The first ten-year term of the lease ended on June 30, 1983. Anticipating that event, Robert Karch, then Centerre's president, phoned Mr. Adams in October, 1982, about extending the lease, and on November 18 sent a letter notifying the defendants, Rodekopf Motors and others of the bank's intention to renew the lease. In its pertinent part, the letter reads,

Gentlemen:

This is to advise that Centerre Bank of Independence, N.A. (formerly First National Bank of Independence), under the rights granted to it by Bill Rodekopf Motors, Inc., a Missouri corporation, pursuant to a document assigning a lease by the said Bill Rodekopf Motors, Inc., to Centerre Bank as security for payment of a debt owed to Centerre Bank, has exercised its rights under said Assign-

ment of Lease because of default in payment of such indebtedness effective the 4th day of November, 1982.

. . . .

As Lessee, under the provisions of paragraph 1.4 of the aforesaid Lease, Centerre Bank hereby notifies Lessor, its successors and assigns, of its intention to exercise the option to extend the term of the Lease for a five (5) year period after the date of termination of the initial term of the Lease. Centerre Bank, as Lessee, also requests Lessor, its successors and assigns, to advise it as soon as reasonably possible the annual rental figure for the aforesaid option period.

Mr. Bliss sent the letter to Mr. Adams with a note advising that he had also heard that Centerre might not have an assignment of the lease.

After sending the notice of renewal of the lease, Centerre sent the next month's rent check, and the defendants deposited it on November 30, 1982. Mr. Adams testified that he advised Centerre by telephone that it had not complied with the lease and that he later wrote to the bank, but defendants sent neither Centerre nor Rodekopf Motors notice of breach or forfeiture of the lease.

In addition to the foregoing evidence, the jury heard the following testimony from Centerre's officers, Paul Weston and Robert Karch.

On direct examination of Mr. Weston, plaintiff's counsel asked about the meaning of the language "a sizeable security interest in the leasehold improvements" found in the bank's March 25, 1980, letter to the defendants. Mr. Weston replied that it meant that Centerre "had extended a $400,-000 loan to Mr. Rodekopf, and we had taken, as a security interest, an assignment on the leasehold improvements, and we wanted to make sure everyone knew this, and we wanted to keep the loan payments current and meet all the conditions of the lease." He also testified that Centerre did not try to keep that loan secret from the defendants.

On cross-examination, Mr. Weston admitted that Centerre had never agreed to as-

sume and perform all of the terms and conditions of the lease and never sought defendants' consent to an assignment of the lease by Rodekopf Motors to the bank. Centerre had never received any word from the defendants excusing compliance with Articles X and XI of the lease. Mr. Weston acknowledged that the bank's officers always knew that at the end of Rodekopf's ground lease the Rodekopf building would revert to the defendant lessors. He also conceded that when he and Mr. Stoneking met with defendants Adams and Bliss in February, 1981, they asked the defendants whether they would consider giving Centerre a lease to the Rodekopf property. The bank officials made that request, he testified, because they knew that Centerre had not complied with lease Articles X and XI, "although we felt that we had fulfilled all the other obligations." By that he meant that Centerre had kept up the rent payments, paid the taxes and kept the building insured.

Centerre's president, Robert Karch, testified that Mr. Stoneking's March 25, 1980, letter to the defendants notified them of the $400,000 loan to Rodekopf Motors. That letter, he said, meant, "We have taken a mortgage on the property." Later, however, he testified that he did not know how the defendants became aware of the $400,000 loan. He confessed that he did not know of Centerre's ever notifying defendants of Rodekopf's assignment of the lease to the bank or of the March 5 deed of trust. He simply said, "I believe we were aware that they were aware of the loan ..." before November, 1982, although he did not tell the defendants of it and did not send them copies of Rodekopf's March 5 note, deed of trust or lease assignment. To his knowledge, before November, 1982, no one at Centerre ever told the defendants of the lease assignment.

Mr. Karch was of the opinion that Centerre had assumed the lease. He felt that the bank had no need to request that defendants consent to Rodekopf's assignment of the lease, and he had no knowledge that the bank ever requested that consent.

Mr. Karch knew that Centerre had an interest to protect and that Rodekopf's and Centerre's interest in the property would terminate in June, 1983, when the first ten-year term of the lease ended unless it was renewed. The thought never occurred to him that Centerre could not renew the lease, although he knew that it had not followed the terms of Article X to become the lessee. His explanation was that no one had ever raised any question that Centerre had not complied with Article X. He admitted, however, that neither he nor others had ever told the lessor defendants of Centerre's claim to be the lessee. "They knew," he said, "They knew." He never explained how the defendants "knew" of Centerre's claim to be the lessee at any time before it sought to renew the lease in late 1982.

As the lease expiration date neared, Mr. Karch examined the lease to see what it required for renewal. He found that notice had to be given six months before expiration of the ten-year term. He called Mr. Adams to see what the renewal rental would be, but Mr. Adams did not call back. Mr. Karch directed the bank officers "to make certain that we were in good standing on the lease," and their inquiry elicited a letter from defendants' property manager saying that the lease was "current." Centerre continued to pay the rent. Then Mr. Karch sent his November 18 letter attempting to exercise Centerre's right of renewal. About the same time, Centerre received the statements for taxes due in December and paid them.

On November 27, 1982, Centerre foreclosed on the building under the terms of its deed of trust, having been precluded from doing so before that by Rodekopf's bankruptcy action filed in August, 1981. Defendants received a copy of the notice of the trustee's sale. The building was sold to Centerre, and the trustee's deed conveyed the leasehold improvements to the bank. Defendants did not object to the trustee's sale.

Early in 1983, Centerre entered into negotiations with defendants in an effort to exercise the option to extend the lease, but

defendants refused to recognize Centerre's exercise of the option. They did, however, continue to accept Centerre's rent payments.

When the lease expired, defendants asked for the key to the building. Centerre advised them that delivery would be delayed or would not occur at all. Defendants then filed an action in unlawful detainer. After negotiations, Centerre agreed to deliver the key if the defendants would dismiss the suit; the defendants agreed, the key was delivered, and they dismissed their suit.

Shortly after the delivery of the key, Centerre Bank filed this action for damages against defendants and their partnership for breach of lease, misrepresentation, trespass, conversion, and malicious prosecution.

After a four day trial, the trial court allowed plaintiff Centerre to submit its case on breach of lease, Count I, and on misrepresentation, Count IV, for actual damages only; the court directed a verdict against Centerre on the petition's remaining counts. The court directed a verdict in favor of plaintiff Centerre on defendants' counterclaims for tortious interference with contract and prima facie tort. The jury returned verdicts for Centerre in the sum of one dollar for breach of lease, Count I, and $291,000 on the misrepresentation claim, Count IV. The trial court denied after-trial motions filed by both parties, and this appeal followed.

## II. Alleged Breach of Lease

■ Defendants Bliss and Adams contend that the court erred in failing to direct verdicts against the plaintiff's claims for breach of lease and for misrepresentation.

A verdict in favor of the plaintiff will be affirmed if substantial evidence supports it. *Gordon v. Oidtman,* 692 S.W.2d 349, 352 (Mo.App.1985). In determining whether substantial evidence exists to support a verdict, the appellate court accepts as true the plaintiff's evidence and disregards the defendant's evidence, except insofar as it aids the plaintiff's case. *Zabol v. Lasky,* 555 S.W.2d 299, 304 (Mo.1977) (en banc).

"Sustaining a motion for a directed verdict is a drastic action and should only be done when all the plaintiff's evidence and reasonable inferences therefrom are so strongly against the plaintiff that reasonable minds cannot differ." *Duke v. Gulf & Western Manufacturing Co.,* 660 S.W.2d 404, 409 (Mo.App.1983).

Substantial evidence must, however, support each element of the plaintiff's case. *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 551 (Mo.App.1983). Accordingly, in this case to establish a submissible case on the breach-of-lease claim, plaintiff Centerre had first to establish by substantial evidence that it somehow became the lessee. Centerre bases its claim that it acquired status as a lessee on the assignment of the lease from Rodekopf and the defendants' waiver of the lease provision requiring consent to the assignment of the lease.

The evidence establishes that Mr. Rodekopf executed an assignment of the lease to Centerre. At the same time, however, the evidence established beyond doubt that Centerre never sought the defendants' consent to the assignment, as Article X of the lease required. Centerre argues instead that the defendants waived their right to require compliance with this provision. Waiver is the intentional relinquishment of a known right. *Lucas Hunt Village Co. v. Klein,* 358 Mo. 1054, 218 S.W.2d 595, 599 (1949) (en banc); *Haack v. Great Atlantic & Pacific Tea Co.,* 603 S.W.2d 645, 653 (Mo.App.1980). It may be inferred from the actions of the parties, but the acts upon which the person asserting waiver relies must clearly and unequivocally establish the intent to waive known rights. *Haack, supra,* at 653–54.

Centerre relies primarily upon Noland South's acceptance of rent as evidence of waiver. In March of 1980, Centerre advised the defendants by letter that, "until you are notified otherwise," it would pay the rent under the lease from Rodekopf's escrow account with the bank. In that letter, Centerre explained that the purpose of the escrow arrangement was to protect the bank's security interest in the leasehold

improvements on the land, but it did not describe the nature of the security interest. Although Rodekopf Motors failed to pay the bank after June, 1980, Centerre did not "otherwise" notify the defendants and continued to pay rent, ostensibly from the escrow account, until the lease expired in June, 1983.

The defendants learned in December, 1980, that Rodekopf Motors had gone out of business. At a January, 1981, meeting with Mr. Rodekopf and bank officers, the defendants learned that Mr. Rodekopf still had charge of the building. At that time Centerre declined to become the tenant in Rodekopf Motors' place. The bank did, however, express its desire to make the payments necessary to keep the lease in effect.

At the February, 1981, meeting the defendants rejected Centerre's offer to buy the land. During that meeting Mr. Weston said that Centerre wanted to "take over" for Rodekopf, but it never executed a written assumption of the lessee's obligations under the lease as required by Article X. The bank failed to provide the defendants with the required notice of Rodekopf's 1980 assignment of the lease until November 18, 1982, when it tried to extend the term of the lease. At that time, the defendants notified the plaintiff that it could not exercise the extension provision because it had no valid assignment of the lease. The bank then foreclosed on the security interest in the leasehold improvements and bought the building at the foreclosure sale. After that, the bank continued to make rental payments, and the defendants accepted the payments.

On March 25, 1980, Centerre began to pay Rodekopf's rent payments and assured the defendants that "[a]ll future payments, until you are notified otherwise" would come "via an escrow we have with Bill Rodekopf Motors, Inc." Defendants' acceptance of those payments could hardly constitute a waiver of their right to require compliance with the provision governing assignment of the lease. All later payments came from the same escrow account. Payment in that manner accorded with Centerre's stated desire to use the escrow account to protect its security interest, and later its ownership interest, in the leasehold improvements by keeping the Rodekopf lease in force.

Although the defendants learned of Rodekopf's financial failure, they had no reason to object to Centerre's use of the escrow account to keep the lease alive. Noland South could, therefore, accept rental payments without accepting the bank as the lessee. Centerre's president testified that no one at the bank notified the defendants of the lease assignment before November, 1982. No substantial evidence supported his conclusion that "they knew" of the assignment. Mr. Weston's ambiguous statement that "we would take over" for Rodekopf and the defendant's failure to object to that statement did not comprise the "clear and unequivocal" evidence required by *Haack, supra,* to establish a waiver of the defendant's rights under the lease.

Centerre failed to establish by substantial evidence that it ever became the lessee, therefore, it cannot prevail in a suit for a breach of the lease. The court erred when it failed to direct a verdict for the defendants on Count I.

### III. Alleged Fraudulent Misrepresentation

Defendants also appeal from the trial court's failure to direct a verdict on the misrepresentation claim. To establish a submissible case of fraudulent misrepresentation the plaintiff must present substantial evidence to establish: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that the hearer will act upon it in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth of the representation; (8) the hearer's right to rely on it; and (9) that his reliance caused the hearer's injury. *Yerington v. Riss,* 374 S.W.2d 52, 57 (Mo. 1964); *Fairmont Foods Co. v. Skelly Oil Co.,* 616 S.W.2d 548, 550 (Mo.App.1981).

■ The plaintiff bears the burden of proof for each element of fraud, *Grosser v. Kandel–Iken Builders, Inc.*, 647 S.W.2d 911, 914 (Mo.App.1983), and must satisfy that burden with clear and convincing evidence. *Id.; Bolten v. Colburn*, 389 S.W.2d 384, 390 (Mo.App.1965). "Fraud imputes venality and corruption to the person charged with it, and both reason and law require clear and convincing proof of it." *Gibson v. Smith*, 422 S.W.2d 321, 328 (Mo. 1968). Therefore, "[a]ll doubt should be entertained in favor of good faith in determining whether a statement constitutes a representation." *Grosser, supra* at 914; *see also Bolten, supra* at 390.

Plaintiff Centerre sought to establish a misrepresentation-by-omission to show fraud in this case. It argues that defendants Bliss and Adams failed to inform plaintiff that they had no intention to accept the bank as assignee of the lease and, by that omission, fraudulently induced Centerre to continue paying rent and incurring other expenses on the leasehold property.

■ Misrepresentation of a material fact by silence may amount to actionable fraud. *Miller v. Higgins*, 452 S.W.2d 121, 124 (Mo. 1970). Before silence may add up to misrepresentation, however, the silent party must have a duty to speak. *Taylor v. Western Casualty & Surety Co.*, 523 S.W. 2d 582, 586 (Mo.App.1975). That duty to speak arises when the silent party is a fiduciary or possesses superior knowledge. *Riley v. White*, 231 S.W.2d 291, 298 (Mo. App.1950). The duty to speak does not arise when the other party has knowledge of the facts. *Taylor, supra.*

In *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.*, 705 S.W.2d 42 (Mo. App.1985), the jury returned a verdict for fraud against a bank that had failed to inform the plaintiffs that the bank had classified as a "problem note" a note they were signing as guarantors. The bank called the note three days after the plaintiffs signed. We reversed the judgment, finding that, because no confidential relationship existed between the bank and its customers, the bank had no duty to disclose that it had classified the note as a problem note. The plaintiffs had equal access to information concerning the financial status of the maker of the note, therefore, they bore the responsibility to investigate for themselves before signing the note as guarantors. *Id.* at 53.

■ In the present case, Centerre contends that defendants Adams and Bliss knew that they had not consented or did not intend to consent to Rodekopf's assignment of the lease to the bank. Defendants base this contention on the defendants' failure to respond to Centerre's statement at the February, 1981 meeting that it would "take over" for Rodekopf. Nothing in the evidence indicates, however, that Adams and Bliss then knew that Centerre held a security interest in anything other than the leasehold improvements, title to which remained in the lessee during the term of the ground lease. Mr. Karch admitted that no one at the bank notified the defendants of the lease assignment until November, 1982.

Even if we assume that the defendants somehow learned that Rodekopf had assigned the lease to the bank, they had no duty to inform the bank that it had not complied with Article X, the lease provision governing assignment. Plaintiff's officers knew that the bank had not complied with Article X. Centerre had a copy of the lease; its officers had read the lease; and they were aware that Article X allowed assignment only after the assignee agreed in writing to assume and comply with the terms of the lease and Noland South consented to the agreement.

Unless Centerre executed an assumption of the lease covenants, the defendants would have been unable to enforce the lease against the bank. If Centerre had determined that its investment did not justify keeping the lease alive, the only recourse for Adams and Bliss would have been against the bankrupt Rodekopf, and that could have led to immediate termination of the lease. Obviously, Centerre's continued payment without assumption of the lease obligations best protected its interest in the leasehold during the term of the lease. In fact, Centerre followed that course of action, paying what it had to to

keep Rodekopf's lease alive but assuming no further obligations. Thus it could and did maintain control of its security interest in the leasehold improvements until the expiration of the lease, always free to walk away at any time before that date without incurring further obligation or expense.

The plaintiffs in *Centerre Bank of Kansas City v. Distributors, Inc., supra,* could not recover for an alleged misrepresentation-by-silence when they were aware of, or could have discovered, the true financial status of the debtor corporation before guarantying its note. The defendant bank had no duty to disclose that it had classified the note as a problem note. Similarly, the plaintiff Centerre here cannot complain that the defendants misrepresented the bank's status as assignee when the bank could have assured that status by complying with Article X. Because Centerre was aware of the terms of Article X, the defendants had no duty to inform the bank that it had no valid assignment of the lease.

Centerre also advances Noland South's acceptance of rent as evidence of misrepresentation. As we discussed in relation to Count I, Centerre's payment of rent conformed to its status as Rodekopf's escrow agent and later with its status as owner of the leasehold improvements. When conduct accords as well with good faith as with fraud, the courts will resolve the doubt in favor of good faith. *Grosser v. Kandel–Iken Builders, Inc., supra,* at 914. In this case, the evidence falls far short of rebutting the presumption that the defendants accepted the rental payments in good faith recognition of Centerre's status as an escrow agent and secured creditor.

Centerre failed to present substantial evidence to establish misrepresentation by defendants Bliss and Adams. Therefore, we conclude that the trial court erred in not directing a verdict for the defendants on Count IV.

### IV. Defendants' Counterclaim

Defendants Bliss and Adams also contend that the court erred in directing a verdict against them on their counterclaim for tortious interference with contractual relations. To establish that cause of action, a plaintiff must show the following elements: (1) a contract or valid business relationship of expectancy; (2) defendant's knowledge of the contract or relationship; (3) defendant's intentional interference inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from the defendant's conduct. *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo.1979) (en banc); *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524 (Mo.App.1981). Substantial evidence must support each element of the cause of action. *Francisco, supra,* at 529.

Here, the defendants' claim must fail because they did not establish that they suffered damage as a result of Centerre's conduct. Centerre, as Rodekopf's escrow agent continued to fulfill the obligations of the lease after Rodekopf could no longer pay the bank. Although Centerre claims that it did this in the belief that it had become the lessee, its actions allowed the defendants to realize the benefits of the lease: the rental payments, insurance on the leasehold improvements and maintenance of the building. Therefore, the defendants have failed to establish by substantial evidence any damage they suffered as the result of any interference with their rights under the lease. The trial court properly directed a verdict against the defendants on their counterclaim.

### V. Nominal Damage Award

Plaintiff Centerre appeals from the trial court's failure to grant a new trial after the jury awarded only nominal damages on the verdict for breach of the lease and from the court's failure to submit punitive damages on its misrepresentation claim. Because we have concluded that the plaintiff failed to establish submissible claims for either a breach of the lease or for misrepresentation, both of these assignments of error must fail.

Accordingly, we reverse the judgement in favor of Centerre on Counts I and IV

and affirm the judgment against the defendants on their counterclaim.

All concur.