The KANSAS CITY DOWNTOWN
MINORITY DEVELOPMENT
CORPORATION, Appellant,

v.

CORRIGAN ASSOCIATES LIMITED
PARTNERSHIP, et al.,
Respondents.

No. WD 46938.

Missouri Court of Appeals,
Western District.

Jan. 11, 1994.

Kirk H. Doan, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, for appellant.

James C. Lieber, Jr., Mitchell, Kristl & Lieber, P.C., Kansas City, for respondents.

Before BRECKENRIDGE, P.J., and KENNEDY and LOWENSTEIN, JJ.

BRECKENRIDGE, Presiding Judge.

The Kansas City Downtown Minority Development Corporation (DMDC) appeals the judgment of the trial court in favor of Wedgestone Financial and its subsidiary Corrigan Building Corporation (together, "Wedgestone") upon DMDC's civil suit for judicial foreclosure and equitable subrogation and for damages stemming from a loan made by DMDC to Corrigan Associates Limited Partnership (Corrigan Associates). DMDC also appeals the trial court's denial of DMDC's motion for a new trial. DMDC raises five points on appeal, contending that the trial court erred in (1) failing to find for DMDC on its fraudulent misrepresentation

claim; (2) failing to find for DMDC on its fraud by silence claim; (3) failing to find for DMDC on its civil conspiracy claim; (4) denying DMDC the equitable remedy of subrogation; (5) denying DMDC a jury trial and denying DMDC's motion for a new trial before a jury.

The judgment of the trial court is affirmed.

*Financing for the Corrigan Building Project*

During the 1980s, Corrigan Associates purchased for renovation and rehabilitation a ten-story office building ("Corrigan Building"), including a parking lot and related improvements, located at 1828 Walnut, Kansas City, Jackson County, Missouri. The purchase was originally financed by a $3.6 million dollar promissory note and first deed of trust recorded November 15, 1984, to Master Mortgage Fund Trust IV (Master Mortgage).

DMDC is a not-for-profit corporation formed by the City of Kansas City and is the entity through which Urban Development Action Grants and Loans (UDAG) from the federal Department of Housing and Urban Development (HUD) are made to borrowers in Kansas City. Corrigan Associates entered into a UDAG grant agreement for the Corrigan Building project which was preliminarily approved on April 6, 1984, and signed by the Secretary of HUD on May 10, 1984.

During the summer of 1985, Corrigan Associates sought a short-term bridge loan from Wedgestone to sustain the Corrigan Building project until the closing of the UDAG loan and pending industrial revenue bonds. In August of 1985, Wedgestone loaned Corrigan Associates $1.8 million, to be repaid within four months.

Shortly after Wedgestone made the $1.8 million loan, the pending industrial revenue bonds for the Corrigan Building project were disqualified for tax-exempt treatment and attempts to close the UDAG loan failed. Corrigan Associates did not repay the Master Mortgage and Wedgestone loans in late 1985 or early 1986 as expected, and soon defaulted on the loans. When Master Mortgage started foreclosure proceedings, Wedgestone purchased the $3.6 million Master Mortgage note and deed of trust, thereby preventing

Master Mortgage from extinguishing Wedgestone's junior interest.

Corrigan Associates attempted to find long-term financing in early 1986. Having little success, Corrigan Associates asked Wedgestone to provide the financing. Wedgestone agreed to provide the long-term financing under a loan commitment dated May 28, 1986, whereby Wedgestone agreed to loan Corrigan Associates $7.5 million.

Robert J. Riley, a former loan officer for Wedgestone, testified that before the closing of the $7.5 million loan, he inquired as to the status of the UDAG loan. Ronald B. Durning, a general partner of Corrigan Associates, assured him that the UDAG loan would close simultaneously with the Wedgestone $7.5 million loan. Mr. Riley also testified that John D. Bower, an administrative officer for the Department of Housing and Community Development of Kansas City, told him in May or June of 1986 that the UDAG loan would close around August 1, 1986. Mr. Bower testified that he did not specify exactly when the UDAG loan would close, saying only that "it could take a couple months." According to Mr. Bower, when Mr. Riley asked him what effect closing the $7.5 million Wedgestone loan before the UDAG loan would have on the UDAG loan, Mr. Bower advised him that he "didn't see a problem, although there was a risk that [the UDAG loan] would not be approved, but if they closed their loan and went ahead and funded, the UDAG [loan] would eventually close and catch up if it was approved by HUD."

On June 5, 1986, DMDC sent materials provided by Corrigan Associates to HUD requesting that HUD make certain amendments to the grant agreement covering the Corrigan Building. DMDC asked that Wedgestone be substituted as the primary lender on the project and that all references to the industrial revenue bond issue in the former agreement be deleted. By letter dated July 29, 1986, James I. Threatt, Assistant City Manager of Kansas City and Director and Secretary of DMDC, informed Wedgestone:

[O]n July 24, 1986 the Office of Action Grants of the Department of Housing and Urban Development approved the pro-

posed permanent financing for the Corrigan Building Project which specifically provides for the subordination of a $1.012 million UDAG loan to a loan or loans of $7.5 million from Wedgestone.

On July 31, 1986, Wedgestone closed three loans to Corrigan Associates: a $6 million loan, $1.5 million loan, and a $397,543 loan. In addition to providing new loan proceeds, the Wedgestone $6 million and $1.5 million loans paid off the $1.8 million loan Wedgestone made to Corrigan Associates in 1985 and refinanced all except $900,000 of Wedgestone's purchase of the $3.6 million Master Mortgage loan. The $397,543 loan secured a note capitalizing unpaid interest owed to Wedgestone from the 1985 $1.8 million loan. After the loans were recorded, the priority among the liens created by the respective deeds of trust on the Corrigan Building was as follows:

1. Master Mortgage $3,600,000 deed of trust purchased by Wedgestone (with a remaining balance of $900,000);
2. Wedgestone $6,000,000 deed of trust;
3. Wedgestone $1,500,000 deed of trust; and
4. Wedgestone $397,543 deed of trust.

On August 15, 1986, the Kansas City City Council approved the amended UDAG grant agreement with HUD. The City–DMDC–Developer UDAG Loan Agreement between the City of Kansas City, DMDC, and Corrigan Associates and loan documents consisting of the DMDC promissory note, deed of trust, and conditional assignment of rents were finalized, signed, and sent to HUD for final approval in October of 1986. The DMDC note provided:

This Note will be considered in default ... (iii) upon any default under the Prior Deed(s) of Trust, which could permit a foreclosure by the prior mortgagees upon the taking of any action by a prior mortgagee that is adverse to or impairs the security interest of Lender.

The DMDC deed of trust included a similar default provision, and also contained the following "subrogation provision": "Beneficiary [DMDC] is hereby subrogated to the claims and liens of any claim, mortgage, real estate contract, or other liens discharged, in whole or in part, by the proceeds of the lien hereby secured."

The City of Kansas City was notified by letter dated December 15, 1986 that HUD had formally approved the UDAG loan for the Corrigan Building. The section of the City–DMDC–Developer loan agreement addressing actual disbursement of the loan upon HUD approval provided:

DMDC will disburse the UDAG Funds to Developer based on payment requests in the form attached hereto as Exhibit "D", submitted by Developer to DMDC and approved by DMDC, in accordance with the Loan Documents. All payment requests shall be for costs incurred for the Project and shall be fully documented by invoices, receipts, paid bills, and contractors', architects', and owners' certificates as required by the City.

The City–DMDC–Developer loan agreement limited the disbursements allowed to $1.00 of UDAG funds for every $6.91 of qualified private funds expended by Corrigan Associates on the project. At the request of DMDC as proof of the "qualified private funds" expended by Corrigan Associates, the treasurer of Wedgestone submitted to DMDC a "Treasurer's Certificate," dated December 23, 1986. The Treasurer's Certificate verified (1) that the amount of interest, default interest, origination fees, and other charges paid by Corrigan Associates and received by Wedgestone in connection with the discharge of Wedgestone's August 1985 $1.8 million deed of trust was $754,973.42; (2) that the total interest and other charges paid by Corrigan Associates to Wedgestone on the $6 million and $1.5 million deeds of trust was $583,752.79; and (3) that the money paid on the $6 million and $1.5 million deeds of trust were paid out of a "construction period interest escrow account funded by Loan proceeds, which escrow account is held by Wedgestone pursuant to agreement with Corrigan [Associates]." Wedgestone's treasurer certified that the information provided in the certificate was true and accurate and could "be relied upon [by DMDC] in connection with [DMDC's] preparation of documentation with respect to draw on the Kansas City letter of

credit in the manner provided for by the Corrigan Building Project UDAG Loan Documents."

On January 22, 1987, the DMDC deed of trust was recorded. Also filed on January 22, 1987, was a subordination agreement executed by Wedgestone in which Wedgestone agreed to subordinate the $397,543 Wedgestone deed of trust and related conditional assignment of leases and rents, security agreement, and financing statements to the DMDC deed of trust. A statement of priority executed by DMDC and filed on January 22, 1987, provided that the priority between and among the Wedgestone deeds of trust and the DMDC deed of trust would be: first, the Wedgestone $6 million deed of trust; second, the Wedgestone $1.5 million deed of trust; and third, the DMDC deed of trust.

In order to actually receive funds from the UDAG loan, Corrigan Associates had to submit a Certification and Requisition for Funds (requisition) as set out in the City–DMDC–Developer loan agreement. Each requisition required certification that "each item for which payment is requested hereunder is properly payable from the loan proceeds in accordance with the terms and conditions of the Loan Agreement."[1] Corrigan Associates sent its first requisition to DMDC on December 19, 1986.

DMDC first funded the UDAG loan on January 22, 1987, issuing check number 3102 in the amount of $941,737.50 and check number 1014 in the amount of $4,200.00. These checks were made payable to Wedgestone pursuant to a letter of authorization executed by Corrigan Associates and were used to discharge the remaining balance due under the $3.6 million note Wedgestone purchased from Master Mortgage. With the discharge of the $3.6 million note, Wedgestone's subordination agreement, and DMDC's statement of priority, the liens created by the respective deeds of trust on the Corrigan Building stood in relationship to each other as of January 22, 1987, in the following order of declining precedence:

1. Wedgestone $6,000,000 deed of trust;
2. Wedgestone $1,500,000 deed of trust;
3. DMDC deed of trust;
4. Wedgestone $397,543 deed of trust.

Corrigan Associates filed additional requests with DMDC for the disbursal of funds from the UDAG loan after January 22, 1987. On March 5, 1987, $18,701.94 was disbursed in one draw and $111.00 was disbursed in another; on April 1, 1987, $13,508.82 was distributed; and on April 14, 1987, $15,800.63 was paid out. Each of the payments was made in the form of a check payable to McDaniel Title Company as escrow agent for Wedgestone.

*The Wilson Judgment Lien and the April 21, 1987 Default Letter*

Prior to the closing and funding of the UDAG loan in 1987, Aaron A. Wilson, an attorney who represented Corrigan Associates in 1984 and 1985, demanded that Wedgestone pay his attorney fees incurred on behalf of Corrigan Associates in the failed attempt to get industrial revenue bond financing for the project. Mr. Wilson, who was also counsel for DMDC, wrote to Mr. Riley on August 11, 1986, and demanded

---

1. DMDC argues that Corrigan Associates executed the Certifications and Requests for Funds for seven draws stating there were no events of default on the Wedgestone liens when this was untrue. DMDC misstates both the contents of the certificates and the terms of the DMDC loan agreement. Among the many terms and conditions of the loan agreement was a requirement that Corrigan Associates as the developer represent and covenant that "there is no litigation or proceeding pending, or to the knowledge of Developer threatened, against Developer or any other person affecting in any manner whatsoever the right of Developer to execute this Agreement or to otherwise comply with its obligations contained in this Agreement." This representation was made as of October 17, 1986, and not at the times Corrigan Associates requested disbursement of the loan proceeds. The payment requests submitted by Corrigan Associates to DMDC were in the form required by the loan agreement and included a different representation. Each Certification and Request for Funds stated that, "[n]o claims have been made by nor is any suit now pending on behalf of any contractor, subcontractor, laborer, or materialman and further no chattel mortgages, conditional bills of sale, retention of title agreements, security agreements, financing statements or personal property leases have been given or are outstanding as to any fixtures, or equipment now installed in or upon the real property or the improvement thereon."

$111,566.50 in legal fees and expenses, noting in his letter:

> I feel strongly that this debt of the partnership (and of the project) must be included in the completion costs, because, in fact, it is a part of the project. To leave it outside of the schedule of payments from available funds and cash flow will in the future jeopardize the financial structure of the project, which could result in a default and foreclosure by the first and second mortgages, cutting off the third mortgage supporting the UDAG funds.
>
> It was my hope that this matter could be resolved before the UDAG loan issue comes before the Board of Directors of DMDC, through whom UDAG funds flow from the City to the developer. As you know, I am counsel to DMDC and will need to withdraw as their counsel in this matter if it is not resolved, as I will at that time be in an adversarial position with your efforts to obtain those funds.

Mr. Wilson sent a copy of the August 11, 1986, letter to Mr. Threatt.

Wedgestone contended that Mr. Wilson's claim was suspect, given that the bond financing arrangement fell apart before closing. Wedgestone did not pay Mr. Wilson upon receipt of his letter, and on October 7, 1986, Mr. Wilson filed suit against Corrigan Associates. Mr. Wilson obtained a default judgment which became a judgment lien against the Corrigan Building on December 17, 1986.

One of the conditions to DMDC funding the UDAG loan was that there be no liens other than the $6 million and $1.5 million Wedgestone liens ahead of the DMDC lien. Because the UDAG loan had not yet been funded and recorded, the Wilson judgment lien, though junior to all of Wedgestone's liens, would now be senior to any lien granted to DMDC. Upon learning of the Wilson judgment lien, DMDC notified Wedgestone that DMDC would not fund the UDAG loan unless it was guaranteed its contemplated third position in priority behind the $6 million and $1.5 million Wedgestone liens and

was provided a clear title insurance policy to that effect.

In order to help Corrigan Associates obtain the UDAG loan, Kenneth E. MacKenzie, an attorney representing Wedgestone, began working to find a solution to the problem presented by the Wilson judgment lien. Mr. MacKenzie developed a number of possible solutions and presented them to Dorothy Campbell, an attorney who performed legal services for the city of Kansas City and who represented Kansas City on the Corrigan Building project. Mr. MacKenzie testified that after the breakdown of several of his proposals, he worked together with Ms. Campbell and McDaniel Title Company (McDaniel) to find an answer.

According to Mr. MacKenzie, the plan they devised involved McDaniel issuing DMDC a title policy insuring the third-place priority of DMDC's lien, in exchange for which Wedgestone agreed to maintain an escrow account with funds sufficient to discharge Mr. Wilson's judgment lien should he try to execute on it. Wedgestone agreed to place $125,000 in escrow, but was concerned that because of Mr. Wilson's ties to DMDC and knowledge of the Corrigan Building project, Mr. Wilson would find out about the escrow and defeat it by moving to execute on his judgment. To prevent Mr. Wilson from discovering the escrow arrangement, Wedgestone proposed including a confidentiality provision in the escrow agreement making any party who disclosed the existence of the escrow liable for damages.

Mr. MacKenzie testified that he arrived at the escrow idea after consulting with Ms. Campbell and that he asked her whose names from DMDC and the City Attorney's office should be included in the agreement as being the only persons with knowledge of the escrow. Ms. Campbell, though, advised Mr. MacKenzie that the City and DMDC could not bind themselves to the confidentiality provision because they could not afford the risk of Mr. Wilson discovering the escrow account through the actions of the City or DMDC.[2] Wedgestone and McDaniel, along

2. DMDC notes in its brief that the escrow agreement between Wedgestone and McDaniel was

made subject to a confidentiality agreement which did not allow disclosure of the agreement

with Title Insurance Company of Minnesota (Minnesota), proceeded with the escrow plan without the City and DMDC. On January 22, 1987, the same date DMDC funded and recorded the UDAG loan, Wedgestone, McDaniel, and Minnesota entered into the escrow agreement and McDaniel issued a clean policy of title insurance to DMDC insuring that DMDC would receive its third-place position of priority ahead of the Wilson judgment lien.

Although the escrow agreement enabled DMDC to achieve its desired position of priority, it did not resolve the problems the Wilson judgment lien created for Wedgestone. One provision of the escrow agreement authorized McDaniel to use the escrow fund to discharge the judgment lien if the lien remained undischarged six months from the date of the agreement. In April of 1987, Wedgestone became concerned that Mr. Wilson had learned of the existence and terms of the escrow agreement. By letter dated April 13, 1987, Mr. MacKenzie informed Russell W. Gunn, Jr., Chairman of the Board of McDaniel, that he feared Mr. Wilson would just wait until the end of six months after January 22, 1987, and collect his judgment in full from McDaniel. Mr. MacKenzie noted that if Mr. Wilson knew about the agreement as he suspected, Mr. Wilson would have "no incentive whatsoever to settle and eliminate our collective risk in the near future."

In order to extinguish the Wilson judgment lien, Wedgestone decided to foreclose its $397,543 fourth deed of trust which, though subordinated by agreement to DMDC's third deed of trust, was ahead of the Wilson judgment lien in priority. Mr. MacKenzie testified that the goal of this action was to cut off the Wilson lien without disturbing DMDC's deed of trust. During the process of implementing this plan, however, Wedgestone's local Missouri counsel stated it could not guarantee that foreclosing the $397,543 deed of trust would eliminate the Wilson lien, but it could guarantee foreclosure of the $1.5 million deed would do so.

to DMDC, but acknowledged that "DMDC may have been told that an escrow account had been

Accordingly, on April 21, 1987, Wedgestone issued a default letter notifying Corrigan Associates that it had published a notice of foreclosure of certain instruments securing its loan to Corrigan Associates. The notice of foreclosure referenced in the letter specified that the deed of trust being foreclosed was Wedgestone's $1.5 million deed of trust. The letter stated that Wedgestone was initiating foreclosure proceedings "because of numerous monetary and nonmonetary defaults under the Loan Documents including failure to pay interest and other charges when due, failure to deliver essential insurance policies and failure to discharge the lien of a judgment entered without Wedgestone's consent on the Corrigan Building securing Wedgestone's loan."

On May 27, 1987, Corrigan Associates and Mr. Wilson agreed to a compromise settlement of Mr. Wilson's claim. Mr. Wilson agreed to accept $75,000 in exchange for releasing his lien.

*Events Following Settlement of the Wilson Judgment Lien*

After the Wilson judgment lien settled, Wedgestone stopped noticing its $1.5 million deed of trust for foreclosure, and on June 11, 1987, began noticing its $397,543 deed of trust for foreclosure. Wedgestone's treasurer testified that the $397,543 deed of trust, which was subordinated to DMDC's third deed of trust, was noticed for foreclosure because Corrigan Associates had not been paying interest it owed Wedgestone. Wedgestone noticed the $397,543 deed for foreclosure proceedings to "put some pressure" on Corrigan Associates "to get them to come up with money to pay the interest, to pay the debt that they owed." When Corrigan Associates paid approximately $300,000 against the Wedgestone loans, Wedgestone entered into a forbearance agreement with Corrigan Associates on August 1, 1987. The events of default identified by the forbearance agreement were that the May, 1987 payment and the payments due thereafter on the $7.5 million loan were not fully paid and that no payments of any kind had been made

set up."

on the $397,543 note. As part of the forbearance agreement, Wedgestone agreed not to exercise its right to foreclose its deeds of trust for twelve months.

On December 7, 1989, DMDC filed its initial petition in this case, claiming in part an equitable right to have the DMDC deed of trust and its related security instruments declared a first lien against the Corrigan Building and any interests of Wedgestone declared subordinate and inferior to DMDC's lien.[3] On or about December 15, 1989, DMDC filed a notice of lis pendens against the Corrigan Building.

Wedgestone finally foreclosed its deeds of trust on the Corrigan Building on August 24, 1990. Wedgestone purchased the Corrigan Building at the foreclosure sale and subsequently transferred the building to its subsidiary, Corrigan Building Corporation.

DMDC filed a fourth amended petition on July 20, 1992. This fourth and final petition included a fourth count for conspiracy to defraud. Among the allegations made in the petition were claims that (a) the requisitions by which Corrigan Associates requested loan proceeds from DMDC contained false representations about pending or threatened legal proceedings; (b) DMDC was not told about events of monetary and nonmonetary default which had occurred under the Wedgestone deeds of trust prior to DMDC's agreement to loan funds to Corrigan Associates and prior to disbursal of the loan proceeds; (c) Corrigan Associates and Wedgestone falsely represented to DMDC that there were sufficient funds to complete the project; and (d) the December 23, 1986, Treasurer's Certificate from Wedgestone contained false certifications.

A non-jury trial was held in this case commencing on September 8, 1992, and ending on September 10, 1992. By judgment entered September 21, 1992, the trial court found that DMDC was not entitled to equita-

ble relief and that its $1,012,000 deed of trust and related security instruments against the Corrigan Building had been extinguished. DMDC subsequently filed a motion for a new trial or to amend the judgment, which was denied on October 5, 1992. This appeal now follows.

In its first three points on appeal, DMDC contends that the trial court erred in failing to find for DMDC on its claims for fraudulent misrepresentation, fraud by silence, and civil conspiracy because "the undisputed evidence at trial established each of the elements of [its] claim." In its fourth point, DMDC claims that the trial court erred in denying DMDC the equitable remedy of subrogation because "the undisputed evidence at trial proved fraud and conspiracy by Wedgestone."

■ DMDC's argument is essentially that the decision of the trial court on each of these points is against the weight of the evidence. On appeal, the decision of the trial court in this court-tried case must be affirmed unless there is no substantial evidence to support the decision, the decision is against the weight of the evidence, or the decision erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The evidence presented at trial will not be reweighed on appeal, *Hansen v. James*, 847 S.W.2d 476, 479 (Mo.App.1993); rather, this court will "accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence." *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989).

I.

■ DMDC contends as its first point on appeal that the trial court erred in failing to find for DMDC on its fraudulent misrepresentation claim. The nine elements that

3. The initial petition of DMDC was in three counts. In Count I, DMDC claimed damages against Corrigan Associates for nonpayment of the DMDC note. In Count II, DMDC claimed damages against Corrigan Associates' general partners Brook Financial Corporation (Brook) and Ronald B. Durning as guaranties. Under Count III, DMDC sought relief against Wedge-

stone and the other defendants, requesting judicial foreclosure of the DMDC deed of trust and a declaration that DMDC deed was a first lien against the Corrigan Building. DMDC obtained judgments by default against Corrigan Associates, Brook and Durning; therefore Counts I and II were not litigated in this action.

must be established to prevail on a fraud claim are:

1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity, or his ignorance of its truth; 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of the falsity of the representation; 7) the hearer's reliance on the representation being true; 8) his right to rely thereon; and 9) the hearer's consequent and proximately caused injury.

*Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988).

Each of these elements must be proven; the failure to establish any one of the elements precludes recovery. *Id.*

As the basis for its fraudulent misrepresentation claim, DMDC cites several statements made by Wedgestone in the December 23, 1986, Treasurer's Certificate prepared by Wedgestone at DMDC's request. The Treasurer's Certificate verified (1) that the amount of interest, default interest, origination fees, and other charges paid by Corrigan Associates and received by Wedgestone in connection with the discharge of Wedgestone's August 1985 $1.8 million deed of trust was $754,973.42; (2) that the total interest and other charges paid by Corrigan Associates to Wedgestone on the $6 million and $1.5 million notes was $583,752.79; and (3) that the money paid on the $6 million and $1.5 million note was paid out of a "construction period interest escrow account funded by Loan proceeds, which escrow account is held by Wedgestone pursuant to agreement with Corrigan [Associates]." Furthermore, the certificate stated that the information contained within it "is true and accurate as of the date of this Certificate and may be relied upon in connection with your preparation of documentation" with respect to funding the UDAG loan. DMDC argues that, unknown to DMDC, "$397,000 of the 'payment' on the Wedgestone $1.8 million loan was a worthless note; only $43,678.44 had been paid in interest on Wedgestone's $7.5 million loan; and, there was no escrow account." The trial court found that DMDC did not rely on the

Treasurer's Certificate in making or funding the loan.

The evidence at trial established that HUD preliminarily approved the UDAG loan for the Corrigan Building on July 24, 1986, and the city council of Kansas City approved the amended UDAG grant agreement on August 15, 1986. The City–DMDC–Developer UDAG Loan Agreement was finalized, signed by representatives of Kansas City, DMDC, and Corrigan Associates, and sent to HUD for final approval in October of 1986. Because Wedgestone did not provide the Treasurer's Certificate to DMDC until late December of 1986, the trial court's finding that DMDC did not rely on the Treasurer's Certificate in agreeing to make the loan to Corrigan Associates is not against the weight of the evidence.

DMDC contends that it relied upon statements made in the Treasurer's Certificate in disbursing the UDAG loan proceeds. Mr. Bower testified that he used the figures contained in the Treasurer's Certificate to compute the first draw against the loan proceeds, and that if he had known that Corrigan Associates had failed to pay the interest due under Wedgestone's deeds of trust, he would not have funded the first draw. Mr. Bower did not accept the Treasurer's Certificate's figures without question, however. Mr. Bower admitted that after reviewing the Treasurer's Certificate he contacted Mr. Riley at Wedgestone and asked for "a breakdown as to what those particular items other than interest were," and that Mr. Riley "fully explained" the figures in terms of breaking them down. Mr. Bower testified that Mr. Riley explained that the figure of $754,973.42 included interest paid to Master Mortgage under the $3.6 million loan eventually purchased by Wedgestone as well as $397,543 "owed to Wedgestone." Mr. Bower listed the $397,543 sum in his own calculations as the "7/30/86 Accrued Interest Note." Based upon his own analysis, Mr. Bower made an independent determination not to include for purposes of figuring the first draw $261,885.22 of the $583,752.79 amount that Wedgestone stated in the Treasurer's Certificate was the total interest, as well as other charges paid by Corrigan Associates to

Wedgestone on the $6 million and $1.5 million deeds of trust.

Wedgestone presented further evidence that DMDC did not rely on the Treasurer's Certificate. John W. Meara, a certified public accountant hired by Wedgestone's counsel to analyze the Treasurer's Certificate, testified that from his review of Mr. Bower's notes and other documents, "Mr. Bower didn't seem to rely on the treasurer's certificate. In fact, he took the treasurer's certificate and broke it apart in his calculations." Mr. Meara stated that the Treasurer's Certificate was not very detailed. He gave some examples of where Mr. Bower separated and further defined the figures provided in the certificate and where he added information about them not included in the certificate. Mr. Meara testified that the statement in the certificate implying the existence of a construction period interest escrow account had "no effect at all" in determining the incurred expenses on the project because "whether the amount came out of an escrow account that had been set up in advance or whether it came out of the loan proceeds which were available for the project made really no difference in whether or not the amounts were incurred or not."

The testimony of both Mr. Bower and Mr. Meara, as well as the work notes of Mr. Bower, support the trial court's findings that "DMDC used the treasurer's certificate in only a very limited way in calculating the first draw against the DMDC loan proceeds," and that DMDC "made its own independent analysis and came to its own conclusions with respect to the information contained in the [treasurer's] certificate." A party who has made an independent investigation "is presumed to have relied on what he learned from that investigation and may not claim that he relied on a misrepresentation." *Mobley v. Copeland,* 828 S.W.2d 717, 726 (Mo. App.1992). The trial court's conclusion that DMDC did not rely upon the statements contained in the Treasurer's Certificate is not against the weight of the evidence. Point one is denied.

## II.

As its second point on appeal, DMDC alleges that the trial court erred in failing to find for DMDC on its fraud by silence claim. As the basis of its claim, DMDC cites the "events of default" contained in the April 21, 1987, default letter sent by Wedgestone to Corrigan Associates: "failure to pay interest and other charges when due, failure to deliver essential insurance policies and failure to discharge the lien of a judgment entered without Wedgestone's consent on the Corrigan Building securing Wedgestone's loan." DMDC argues that Wedgestone had knowledge of these events and DMDC did not; that Wedgestone failed to disclose the events to DMDC when Wedgestone was under a duty to do so; that Wedgestone intended to deceive DMDC; that the facts surrounding these events were material to DMDC's decision to make the UDAG loan; that DMDC relied on Wedgestone to disclose these events; and that DMDC was damaged as a direct result of Wedgestone's failure to disclose the events to DMDC.

■ A fraud claim may be based upon the misrepresentation of a material fact by silence. *Centerre Bank of Independence v. Bliss,* 765 S.W.2d 276, 284 (Mo.App.1988). The same nine elements required to establish fraud by an affirmative misrepresentation must be proven in a fraud by silence claim, *see id.* at 283–284; however, before a failure to speak can even amount to a misrepresentation, "the silent party must have a duty to speak." *Id.* at 284. A legal duty to speak can arise if the silent party is a fiduciary, *id.,* or if the silent party enjoys superior knowledge, such that a material fact particularly within the silent party's knowledge by reason of this superior knowledge is not within "the fair and reasonable reach of the other party." *Curtis v. Kays,* 670 S.W.2d 887, 893 (Mo.App. 1984). When all parties have knowledge of the facts, the duty to speak does not exist. *Bliss,* 765 S.W.2d at 284.

*Failure to Pay Interest and Other Charges When Due*

■ DMDC argues that the "failure of Wedgestone to disclose the nonpayment and accrual of amounts due under its $7.5 million [loan], and the worthless status of $397,000 of the interest evidence[d] by the $397,000

note" constituted fraud by silence on the part of Wedgestone. DMDC acknowledges its argument in point one on appeal that Wedgestone's Treasurer's Certificate verifying the amount of interest paid by Corrigan Associates on these notes was an affirmative misrepresentation. DMDC notes in its second point on appeal that "the failure to state the true state of affairs concerning the status of interest on these notes was a failure to speak when Wedgestone had superior knowledge and was under a duty to speak."

This court concluded in point one of this appeal that the trial court's finding that DMDC did not rely upon the statements contained in the Treasurer's Certificate was not against the weight of the evidence. If DMDC did not rely on the Treasurer's Certificate, it necessarily follows that DMDC did not rely on Wedgestone's failure to disclose to DMDC the alleged inaccuracies contained in that certificate. The trial court's finding that DMDC did not rely to its detriment upon the absence of any disclosure by Wedgestone concerning the status of its loans to Corrigan Associates and the performance by Corrigan Associates of its obligations to Wedgestone was similarly not against the weight of the evidence.

*Failure to Deliver Essential Insurance Policies*

■ The May 28, 1986, loan commitment under which Wedgestone agreed to provide the $7.5 million loan required that Corrigan Associates provide a life insurance policy in the amount of $7.5 million on the life of Mr. Durning. The loan commitment specified that the proceeds of the policy were to be assigned to Wedgestone, and in the event the policy was not provided at the loan closing, Wedgestone had the right to procure the policy itself, using loan proceeds to pay all premiums and fees.

Corrigan Associates failed to provide the insurance policy at the July 31, 1986, closing of the $6 million and $1.5 million loans. Wedgestone closed the loans without the policy. Mr. MacKenzie testified that Wedgestone waived delivery of the policy at the closing and planned to obtain the policy as a "post-closing matter," but Wedgestone never received or acquired the policy on its own.

The failure to deliver "essential life insurance policies" was one of the events of default noted by Wedgestone in its April 21, 1987, default letter. DMDC argues that the DMDC loan documents provided that the DMDC note would default if an event of default occurred under the Wedgestone deeds of trust which could permit a foreclosure and that an actual declaration by Wedgestone of default was not necessary. DMDC maintains that this event of default existed prior to DMDC closing and funding the UDAG loan, and that the failure of Wedgestone to notify DMDC constituted fraud by silence.

All three of Wedgestone's deeds of trust provide in Section V of each document that:

> Upon the happening of any of the events hereinafter set forth, the MORTGAGEE may, *at its option,* immediately declare the OBLIGATIONS due and payable without notice or demand . . .

> B. Failure, *continuing for ten (10) days after notice,* by MORTGAGOR either in assigning or delivering the policies of insurance required by this Mortgage.

(emphasis added). Section VI D of each document provides that "[a]ny notice required or permitted to be given hereunder to, or served upon, the MORTGAGOR," will be deemed given or served if delivered to or mailed to the mortgagor. The evidence established that the only time Wedgestone asserted that the failure to deliver the life insurance policy constituted an event of default was in the April 21, 1987, letter. Thus, this was not a default "which could permit a foreclosure," pursuant to the DMDC note, before ten days after April 21, 1987. It certainly was not an event of default permitting foreclosure when DMDC closed the UDAG loan or when it funded the loan on January 22, 1987.

The evidence established that the failure of Corrigan Associates to provide the insurance policy was, at the very least, not an event of default permitting foreclosure at the time DMDC closed and funded the UDAG loan, and was not an event of default asserted in the August 1, 1987, forbearance agreement. With respect to the life insurance policy, the

trial court's conclusion that "Wedgestone was under no duty to disclose any information to DMDC which was not disclosed" was not against the weight of the evidence.

*Failure to Discharge the Judgment Lien*

█ DMDC acknowledges in its brief that on December 16, 1986, prior to funding the UDAG loan, it "became aware that Aaron Wilson had obtained a judgment in December, 1986 for $111,000 in attorneys fees by default judgment against Corrigan Associates, which judgment lien attached to the Corrigan Building as of the date of the judgment." DMDC was aware that this lien still existed when DMDC funded the UDAG loan on January 22, 1987, as Ms. Campbell stated it was her understanding that "the insurance company was going to insure over that." Wedgestone did not have a duty to inform DMDC that the Wilson judgment lien existed, because DMDC already had knowledge of its existence. *Bliss,* 765 S.W.2d at 284. DMDC argues that Wedgestone had a duty to tell DMDC that it was "reserving the right to treat the Wilson lien claim as an event of default under its loans with Corrigan Associates."

As with the nondelivery of the life insurance policy, Wedgestone contends that other than asserting the failure to discharge the lien in the April 21, 1987, default letter that Wedgestone claims was directed at Mr. Wilson, "the matter of [the Wilson] judgment lien was never treated by Wedgestone as a default on the part of Corrigan Associates." The only time Wedgestone charged that Corrigan Associates' failure to discharge the Wilson judgment lien was an event of default was in the April 21, 1987, default letter. Once Mr. Wilson's claim was settled with Wedgestone on May 27, 1987, Wedgestone stopped foreclosure on its $1.5 million note. On June 11, 1987, Wedgestone began noticing for foreclosure its $397,543 note, which had been subordinated to DMDC's lien. All foreclosure proceedings were halted by agreement in August of 1987. The failure of Corrigan Associates to discharge the Wilson judgment lien was not mentioned as an event of default in the August 1, 1987, forbearance agreement. Mr. MacKenzie testified that he never "hear[d] any discussion about the Wil-

son matter after it was resolved as being any matter of default or anything else."

Even if Wedgestone considered the failure of Corrigan Associates to discharge the judgment lien an event of default, all three of Wedgestone's deeds of trust on the Corrigan Building provide at their respective Sections V that:

> Upon the happening of any of the events hereinafter set forth, the MORTGAGEE may, *at its option,* immediately declare the OBLIGATIONS due and payable without notice or demand ...
>
> I. The MORTGAGOR fails to remove, by payment or bond, any lien (including a mechanic's or materialman's lien) or attachment affecting the PREMISES, *within ten (10) days after a judgment(s)* (whether or not appealable) has been entered thereon against the MORTGAGOR, which, in the aggregate, total more than $5,000.00.

(emphasis added). Wedgestone's deeds of trust had been matters of public record since they were filed in the office of the recorder of deeds for Jackson County, Missouri on July 31, 1986. Furthermore, Mr. MacKenzie provided Ms. Campbell with a copy of the deeds with his letter of September 18, 1986. If, in fact, Wedgestone considered the failure of Corrigan Associates to discharge the Wilson judgment lien to be an event of default, the fact that it could do so ten days after the judgment was entered was certainly within the "reasonable reach" of DMDC and "discoverable in the exercise of reasonable diligence," such that Wedgestone had no duty to notify DMDC of this possibility. *See Mobley,* 828 S.W.2d at 726 ("The burden is on the party claiming fraudulent nondisclosure to show the undisclosed information was beyond his reasonable reach and not discoverable in the exercise of reasonable diligence.").

The weight of the evidence supports the trial court's finding that Wedgestone did not commit fraud by silence. Point two is denied.

## III.

█ DMDC argues as its third point on appeal that the trial court erred in failing

**222**

to find for DMDC on its civil conspiracy claim. The elements that must be established to prevail on a civil conspiracy claim are (1) an agreement or understanding; (2) between two or more people; (3) to do an unlawful act, or to do a lawful act by unlawful means. *Byers Bros. Real Estate & Ins. Agency, Inc. v. Campbell,* 353 S.W.2d 102, 105 (Mo.App.1961). These elements must be supported by clear and convincing evidence. *Chmieleski v. City Products Corp.,* 660 S.W.2d 275, 290 (Mo.App.1983). Evidence of civil conspiracy may be circumstantial, but it must be clear and convincing. *Id.*

DMDC contends that Wedgestone conspired with Corrigan Associates to fraudulently induce DMDC to make and fund the UDAG loan to Corrigan Associates and that Wedgestone did so in order to reduce its potential loss on the project. DMDC admits that there was no written agreement between Wedgestone and Corrigan Associates to conspire to cause DMDC to fund the UDAG loan in violation of the terms and conditions of the City–DMDC–Developer Loan Agreement, but argues that the evidence "undoubtedly established" the agreement.

In support of its argument, DMDC cites several instances where persons associated with Wedgestone contacted DMDC and inquired as to the status of the UDAG loan before it had closed and assisted in obtaining evidentiary materials DMDC or the City requested. The fact that Wedgestone helped or offered to help accelerate the loan closing process is not clear and convincing evidence that Wedgestone agreed to engage in any civil conspiracy with Corrigan Associates.

DMDC also asserts that Corrigan Associates did not use its own attorney to negotiate the UDAG loan agreement but instead relied on Wedgestone's attorney, Mr. MacKenzie. DMDC notes that a copy of the proposed loan documents were sent to Mr. MacKenzie for his review and that Mr. MacKenzie requested that changes be made in the documents. DMDC also notes that Mr. MacKenzie's law firm billed Corrigan Associates for work performed by the firm in connection with the UDAG loan.

The evidence presented at trial was that Corrigan Associates was represented from July 1984 through December 31, 1985, during which time UDAG loan documents were first prepared and approved for the project, by Mr. Wilson, and from the end of 1985 up until the closing of the $6 million and $1.5 million Wedgestone loans by Ronald Muller. Mr. MacKenzie testified that his "participation" in the negotiations of the UDAG loan consisted of "reviewing [documents] that we thought were appropriate for Wedgestone's concern and our comment, and the numerous conversations I had were primarily housekeeping matters in terms of figuring out what remained to be delivered and where we were in the process." As reflected in a letter to Ms. Campbell dated September 18, 1986, the changes that Mr. MacKenzie requested in the loan documents were related to protecting Wedgestone's interests. Mr. MacKenzie noted specifically that the documents should indicate that the UDAG loan would be subordinate to "principal, accrued interest and other charges under Wedgestone's first and second deeds of trust and also to participating interest under the second deed of trust."

Both Mr. Riley and Mr. MacKenzie testified that Mr. MacKenzie and his law firm represented Wedgestone and that they did not represent Corrigan Associates. The only reason Mr. MacKenzie and his firm billed Corrigan Associates for work done on the UDAG loan was because Corrigan Associates, as the borrower, had agreed to pay all the legal fees and expenses in connection with the loan transaction incurred by Wedgestone, as the lender, pursuant to the May 28, 1986, loan commitment between Wedgestone and Corrigan Associates.

DMDC contends as further evidence that Wedgestone conspired with Corrigan Associates that the UDAG loan was funded based on requisitions filed "by Corrigan Associates and Wedgestone" and the fact that DMDC was directed by a letter of authorization from Corrigan Associates to disburse the UDAG loan proceeds to McDaniel Title Company for the benefit of Wedgestone. The City–DMDC–Developer UDAG loan agreement provided that requests for loan disburse-

ments be made in accordance with the form attached as Exhibit D to that agreement. Corrigan Associates used that form, signed by Mr. Durning, when requesting UDAG funds. DMDC has cited no evidence to support its contention that Wedgestone participated in the filing of these requisitions. The letter of authorization provided that the UDAG loan proceeds were to be used to discharge the $3.6 million first deed of trust purchased by Wedgestone from Master Mortgage. The letter stated that upon receipt by McDaniel of the disbursed proceeds and discharge of the $3.6 deed of trust, "[i]t is our understanding that McDaniel Title will at that point be able to issue to you a $1,012,-000 title policy free of exceptions for Wedgestone's $3,600,000 and $1,800,000 deeds of trust and related security instruments." Neither the requisitions nor the letter of authorization constitutes clear and convincing evidence of an agreement between Wedgestone and Corrigan Associates to defraud DMDC.

The trial court's conclusion that DMDC failed to prove any conspiracy between Wedgestone and Corrigan Associates or between Wedgestone and any other party to defraud DMDC is supported by the weight of the evidence. Point three is denied.

### IV.

As its fourth point on appeal, DMDC asserts that the trial court erred in denying DMDC the equitable remedy of subrogation. DMDC argues that it was entitled to subrogation because the undisputed evidence established at trial proved fraud and conspiracy by Wedgestone. Furthermore, DMDC claims that proceeds of the UDAG loan were used to discharge liens held by Wedgestone at Wedgestone's request. According to DMDC, allowing Wedgestone to maintain its position of priority "would unjustly enrich a wrongdoer."

■■■ The doctrine of equitable subrogation involves "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." *State Sav. Trust Co. v. Spencer*, 201 S.W. 967, 969 (Mo.App.1918) (quoting

37 Cyc. 363). Originally a common law doctrine, subrogation has as its aim the advancement of justice and prevention of injustice. *Frago v. Sage*, 737 S.W.2d 482, 483 (Mo.App. 1987). "Subrogation compels the ultimate payment of a debt by one who, in justice, equity and good conscience, should pay it." *Id.* Although available, subrogation is a fairly drastic remedy and is usually allowed only in extreme cases "bordering on if not reaching the level of fraud." *Landmark Bank v. Ciaravino*, 752 S.W.2d 923, 928 (Mo.App. 1988). A party seeking subrogation must prove by clear and convincing evidence that equity requires another party to bear the loss. *Frago*, 737 S.W.2d at 483.

■■■ This court has already concluded that Wedgestone did not defraud or conspire to defraud DMDC; therefore, DMDC's claim that the fraud and civil conspiracy Wedgestone engaged in support the subrogation of Wedgestone's deeds of trust in favor of DMDC is not compelling. DMDC, however, argues another basis for equitable subrogation in this case. DMDC contends that the DMDC deed of trust grants DMDC subrogation. The DMDC deed of trust provides: "Beneficiary [DMDC] is hereby subrogated to the claims and liens of any claim, mortgage, real estate contract, or other liens discharged, in whole or in part, by the proceeds of the lien hereby secured." DMDC notes that the letter of authorization executed by Corrigan Associates directed that the proceeds of the UDAG loan be used to discharge the Master Mortgage $3.6 million first deed of trust purchased by Wedgestone. DMDC claims that it should hold the first lien on the Corrigan Building to the extent that UDAG funds were used to repay the Master Mortgage/Wedgestone loan, and to the extent UDAG funds exceeded the amount required to discharge that loan, DMDC should receive priority over Wedgestone's other deeds of trust.

■■■ Wedgestone was not a party to the DMDC deed of trust, which was executed and recorded after the Wedgestone deeds of trust. As a general rule, only parties to a contract are bound by the terms of that contract. *Kahn v. Prahl*, 414 S.W.2d 269,

278 (Mo.1967). Thus the DMDC deed of trust itself will not advance DMDC's cause for subrogation.

However, subrogation is not necessarily based on the existence of a contract or privity of contract. *Landmark Bank,* 752 S.W.2d at 931 (Karohl, P.J., dissenting). Courts have granted subrogation to subsequent lenders without contractual guarantees to the extent those lenders loaned money to discharge superior liens "where the lender *intends* to have a superior lien and 'denial of the right would be contrary to equity and good conscience.'" *Id.* (emphasis added) (quoting *State Sav. Trust Co.,* 201 S.W. at 969). DMDC, though, can prove neither that it intended to have a lien superior to the Wedgestone liens nor that the denial of subrogation is contrary to equity and good conscience.

The loan documents indicate that DMDC expected a third place position of priority. The City–DMDC–Developer loan agreement provides:

> The security position of DMDC may only be subordinated to the security interest of Lender [Wedgestone] in the principal amount of Seven Million Five Hundred Thousand Dollars ($7,500,000), plus interest accrued thereon, participating interest and other applicable charges under the Prior Deeds of Trust, plus further advances which are invested in the Project.

The DMDC deed of trust stated "[t]his Deed of Trust is a third deed of trust subject and subordinate in all respects to the Prior Deed(s) of Trust." The statement of priority executed and recorded by DMDC on January 22, 1987, provides that the DMDC deed of trust is subordinated to the $7.5 million Wedgestone deeds of trust. The DMDC statement of priority was executed over one month after Mr. MacKenzie's December 18, 1986, letter to Mr. Bower in which Mr. MacKenzie enclosed Corrigan Associates' letter of authorization directing DMDC to make the first draw of the UDAG loan payable to Wedgestone for the purpose of discharging the $3.6 million Master Mortgage/Wedgestone deed of trust.

DMDC's loan documents and statement of priority indicate that it intended that its deed of trust would be subordinated to the Wedgestone $6 million and $1.5 million deeds of trust and that this expectation did not change upon receipt of the letter of authorization. DMDC's expectation, coupled with the lack of wrongdoing on the part of Wedgestone, support the trial court's decision denying DMDC equitable subrogation. Point four is denied.

## V.

As its fifth point on appeal, DMDC maintains that the trial court erred in denying DMDC a jury trial and in denying DMDC's motion for a new trial before a jury. DMDC argues that it properly objected to the trial proceeding without a jury and that it was entitled to a trial by jury of its "preliminary legal claim" of fraud and conspiracy before the trial court could consider its claim for equitable relief. Wedgestone argues that DMDC waived its right to a jury trial by entering into trial. Wedgestone further contends that DMDC was not entitled to a jury trial because DMDC's request for judicial foreclosure and equitable subrogation invoked the trial court's equity jurisdiction and allowed the trial court to rule on the issues of damages under the "equitable clean-up" doctrine. Because the issue of waiver is dispositive, this court will not address the question of whether DMDC was entitled to a jury trial.

Article I, section 22(a) of the Missouri Constitution guarantees that the right to a trial by jury "shall remain inviolate." Both § 510.190.1, RSMo 1986, and Rule 69.01(a) provide that "[t]he right of trial by jury as declared by the constitution or as given by a statute shall be preserved to the parties inviolate." While guaranteed by constitution, statute, and supreme court rule, the right to a jury trial in a civil action is a personal right and can be waived by a party. *State ex rel. Cunningham v. Luten,* 646 S.W.2d 67, 68 (Mo. banc 1983). Section 510.190.2 and Rule 69.01(b) specify four instances when parties will be deemed to have waived the right to a jury trial: "(1) by failing to appear at the trial; (2) by filing with the clerk written consent in person or by attorney; (3) by oral

consent in court, entered on the minutes; and (4) by entering into trial before the court without objection." Wedgestone argues that DMDC entered into trial before the court without objecting to a trial without a jury, thereby waiving its right to a trial by jury. DMDC contends that it had objected to the trial proceeding without a jury and that it never agreed to waive a jury trial.

■ This court cannot consider on appeal "matters not preserved on the record and contained in an approved transcript." *Lee v. Ofield*, 847 S.W.2d 99, 100–01 (Mo.App.1992). As the appellant in this matter, DMDC bore the responsibility of providing a meaningful transcript for review. *Id.* at 100. A review of the trial transcript reveals neither a demand by DMDC for a jury trial nor an objection to proceeding with a trial before the court. DMDC alleges that during a pre-trial conference held on September 4, 1992, "DMDC was asked to waive its right to a jury trial, which DMDC refused." This court did not receive a transcript of that pre-trial conference. DMDC also asserts that it requested a jury trial in discussions held with the trial court and counsel for Wedgestone in the judge's chambers immediately before trial. This court did not receive a transcript of those discussions.

Not only is there no evidence in the record of the pre-trial conference and in-chambers discussions, but when invited by the trial court during the trial to make a record of those discussions, DMDC did not do so. After calling the case for hearing, the trial court specifically asked, "Perhaps we should put on the record some housekeeping matters. Let's see. Was there anything from our pretrial conference on 9–4–92 that anybody wants to put on the record?" Counsel for both Wedgestone and DMDC then inquired about the exclusion of certain witnesses. The trial court again asked, "Okay. Anything else?" Counsel for DMDC replied, "No, Your Honor, I don't believe the plaintiff has anything." Following a discussion about a stipulation as to the foundation of certain

documents and the numbering of exhibits, the trial court inquired once more, "All right. What else?" DMDC's counsel responded: "That's all of the preliminaries that I believe the plaintiff has."

DMDC contends that it did not need to object on the record to proceeding without a jury because Wedgestone had conceded that DMDC demanded a jury trial. While an appellate court may accept a statement of fact not supported by the record if it is conceded as true by opposing counsel, *see Cardin v. King*, 344 S.W.2d 633, 635 (Mo. App.1961), Wedgestone maintains that it has conceded neither that DMDC demanded a jury prior to trial nor that DMDC objected to proceeding without a jury. An examination of Wedgestone's suggestions in opposition to DMDC's motion for a new trial or to amend the judgment and Wedgestone's brief on appeal reveals no clear concession by Wedgestone that DMDC demanded a jury or objected to a trial before the court. Wedgestone acknowledges that DMDC expressed its desire for a jury trial and was advised by the trial court that "it was its inclination that the case should be heard without a jury." Wedgestone further agrees that the trial court "invited DMDC to bring the propriety of the Court's disposition to the immediate attention of the Court of Appeals if DMDC demurred to proceeding with the trial without a jury" and DMDC declined. Wedgestone, however, argues that DMDC acquiesced in trying the case to the trial court. Wedgestone notes in the conclusion of its suggestions that prior to the trial, both DMDC and Wedgestone vacillated "on whether or not they wanted or were entitled to a jury."[4] Wedgestone related that in the conference prior to trial "[t]he Court cautioned of the need to make a formal objection to preserve any argument over entitlement to a jury trial." Facing this warning, "[c]ounsel for DMDC and Wedgestone each proceeded to try the case with neither de-

4. In its suggestions, Wedgestone directs the trial court's attention to DMDC's letters of January 23 and 29, 1992, sent to the trial court and counsel for Wedgestone, in which DMDC asserted "a jury trial is not necessary," and "[w]hile this fore-

closure and the determination of equitable priorities based on the claim of fraud perpetrated by Wedgestone ... are equitable claims, the Court has authority ... to also award money damages against the responsible parties without a jury."

manding a jury nor objecting to trial without one."

DMDC requested that the trial court include in its findings of fact that DMDC had requested a jury trial and that the trial court had denied its request. When the trial court issued its Findings of Fact, Conclusions of Law and Judgment, the court did not make the requested finding.

Because there is nothing in the record to indicate that DMDC unequivocally demanded a jury and because Wedgestone does not concede that DMDC demanded a jury, this court cannot consider as fact DMDC's claim that it demanded a trial by jury. *Cardin,* 344 S.W.2d at 635. Without evidence of a demand, an objection by DMDC made on the record was necessary to avoid waiver of the right to a jury trial in this case. *See Grimes v. Bagwell,* 809 S.W.2d 441, 444 (Mo.App. 1991).

The failure of DMDC to make a demand or objection on the record indicates that DMDC "enter[ed] into trial before the court without objection." Section 510.190.2; Rule 69.01(b). DMDC waived its right to a jury trial. The trial court properly denied DMDC's motion for new trial before a jury. Point five is denied.

The judgment of the trial court is affirmed.

All concur.